222 So.2d 393 (1969)
Hershel KING
v.
STATE of Mississippi for Use and Benefit of MURDOCK ACCEPTANCE CORPORATION.
No. 45315.
Supreme Court of Mississippi.
April 21, 1969.
*394 William L. Sharp, Corinth, for appellant.
Smith & Downs, Corinth, for appellee.
GILLESPIE, Presiding Justice:
This is an appeal by Hershel King from a decree of the Chancery Court of Alcorn County rendered against him in favor of the State of Mississippi for the use and benefit of Murdock Acceptance Corporation. The basis for the suit was a false notarial certificate of acknowledgment to a deed of trust. (There were two deeds of trust, but for the purpose of this opinion the singular is used.) King is a notary public.
*395 The questions are (1) whether Murdock came into equity with unclean hands, (2) whether the evidence was sufficient to justify the finding that the false notarial certificate was the proximate cause of Murdock's loss, and (3) whether business records entered on and printed out by electronic computing equipment were admissible in evidence. One other question raised by King is without merit and does not justify discussion.
Murdock finances dealers engaged in selling automobiles and mobile homes through the purchase of conditional sales contracts. Serl Anderson was a dealer in mobile homes financed by Murdock. Anderson operated a large distribution center and sold mobile homes through agents at other locations, one of whom was John H. Putt of Corinth, Mississippi. Murdock purchased from Anderson six conditional sales contracts, two of which were cosigned by Putt. Murdock contended that Putt had repossessed the mobile homes described in the contracts. Anderson became a bankrupt and Murdock summoned Putt as a witness at the creditors' meeting. Murdock contended that Putt was liable on the aforementioned six contracts with a total net balance due of about $16,000.
Before the creditors' meeting began, Putt proposed a settlement of Murdock's claim against him and agreed to execute a note to Murdock for $11,000, if Murdock would agree not to call Putt was a witness in the bankruptcy proceeding, and not pursue the makers of the six conditional sales contracts or repossess the mobile homes. As part of this settlement, Putt agreed that the note would be signed by his wife and his parents, J. Harvey Putt and Captola Putt, and it would be secured by a deed of trust on the property belonging to J. Harvey Putt. After investigating the value of the property proposed as security for the $11,000 note, Murdock agreed to the settlement.
Accordingly, the note and the deed of trust were delivered to Murdock and were purportedly signed by John H. Putt and his wife, and J. Harvey Putt and Captola Putt, and the deed of trust securing the note was acknowledged before Hershel King, who entered thereon his certificate of acknowledgment. The deed of trust was placed of record and John H. Putt made several payments, reducing the principal balance to $8,900 at the time this suit was brought. When default was made in the payment of note, Murdock sought to foreclose the deed of trust. J. Harvey and Captola Putt filed suit and enjoined the sale because they had not signed the note and deed of trust and Hershel King's notarial certificate to the acknowledgment on the deed of trust was false. Thereafter, this suit was brought against Hershel King and the surety on his official bond, Hartford Accident and Indemnity Company. At the conclusion of the case the chancellor entered a joint and several decree against Hershel King and Hartford Accident and Indemnity in the amount of $2,000, the amount of the notarial bond, and against Hershel King, individually, for $7,900. King prosecuted this appeal; Hartford Accident and Indemnity Company did not join.
The first question is whether Murdock came into court with unclean hands. King contends that the officials of Murdock were convinced that John H. Putt was part of a fraudulent scheme of Anderson to obtain funds from Murdock through the sale of bogus contracts, and that Murdock was aware that Putt was apprehensive about being questioned under oath at the meeting of the creditors of Anderson because agents of the Federal Bureau of Investigation and Postal Inspectors to be present. It is further contended that Murdock took advantage of the uncomfortable situation of Putt and agreed not to call him as a witness in exchange for his promise to execute the $11,000 settlement note. The evidence showed that the officials of Murdock wanted to find out from John H. Putt the location of the mobile homes securing the six conditional sales contracts, and whether Putt was involved in the alleged fraudulent scheme of Anderson. There was no proof that Murdock or its officials *396 knew that Putt had committed a felony, and there was no agreement that Putt would not be prosecuted. We cannot say the chancellor was manifestly wrong in not finding that Murdock came into equity with unclean hands.
King's next argument is that the false certificate of the notary public was not the proximate or contributing cause of Murdock's loss. It is contended in this connection that Murdock did not expend any additional funds or release any existing rights because of the false certificate; that Murdock had previously paid out its money in the purchase of the six conditional sales contracts. It is also contended that prior to the settlement in which John H. Putt and his wife and parents executed the note and deed of trust that Murdock had only an uncertain claim against John H. Putt, the nature and extent of which was never fully established.
The chancellor found that Murdock relied upon the validity of the notarial certificate and the security of the lien on the property owned by J. Harvey Putt and that the measure of damages was the balance due on the $11,000 note and not the value of the claims against John H. Putt based on the six conditional sales contracts. The proof showed that the property of J. Harvey Putt and described in the deed of trust was worth more than the note it secured. The consideration Murdock gave for the $11,000 note was forbearance to sue John H. Putt as co-signer on two of the conditional sales contracts, forbearance to sue John H. Putt for the alleged conversion of the mobile homes described in the conditional sales contracts, and forbearance of Murdock to exercise its right to attempt repossession of the mobile homes, and forbearance of Murdock to sue the makers of the six conditional sales contracts. We are of the opinion that the chancellor properly determined that the balance due on the $11,000 note was the proper measure of damages and that the proximate cause of this loss was the false notarial certificate. Thomas v. State ex rel. Thorp Finance Corp., 251 Miss. 648, 171 So.2d 303, 13 A.L.R.3d 1030 (1965). In our opinion the proof in this case met the test required by Hodges v. Mills, 149 Miss. 1, 115 So. 112 (1927), in that Murdock proved the value of the land owned by J. Harvey Putt and described in the deed of trust securing the $11,000 note, the amount of the prior liens, and that the security was ample to enable Murdock to collect the balance on the note if the deed of trust had been a valid instrument, and that Murdock was not otherwise able to collect.
The argument on the admissibility of Murdock's business records printed out by electronic computing equipment raises a question not heretofore considered by this Court.
The pleadings made an issue as to the balance due Murdock on the six conditional sales contracts and the balance due on the $11,000 note. In order to prove the amount of damages, it was necessary for Murdock to prove the amounts paid on the note.
The balances due on the six conditional sales contracts were proved by the introduction of the original contracts and computer sheets printed out by an electronic data processing machine. These sheets showed in separate columns as to each of the six conditional sales contracts (1) the originating branch office number, (2) the dealer's number, (3) the individual account number, (4) the gross balance due, (5) the due date, (6) the amount paid, (7) the date of payment, and (8) the payment number. The sheet contained a complete record of each account. The sheet showing the record of the account and payments of the $11,000 note contained the same information.
These computer sheets were admitted in evidence after extensive testimony by W.M. Spiller, Assistant Treasurer and Accounting Manager of Murdock, who is in charge of the data processing department at the home office, and under whose supervision the computerized accounting records are maintained. The following is the substance *397 of his testimony. A centralized system of accounting is kept at the home office by use of a Burroughs B-280 computer, standard equipment and recognized as an efficient and accurate machine. All records are maintained by this computer on magnetic tape. The information is fed into the machine by competent and experienced operators. At the beginning of each transaction it is given a number and the essential information is key punched on a card. The card is then verified by another operator. If the card is not punched correctly it will not go through the verifying machine. The card is then fed into the computer and the information is recorded on magnetic tape. This is Murdock's permanent record of the customer's account. The machine also performs other functions not necessary to relate. As payments are made at branch offices each payment is recorded on receipt blocks and these, together with a travel card for each account involved, are sent to the home office where verification is made by the machine. The payment information from receipt block and the travel card is then fed into the computer and recorded on the customer's account. The branch office could reconstruct the account from copies of cash receipt blocks and other records kept in the branch offices. The records sent from branch offices from which the information is taken to feed into the machine are kept for a period of time, then microfilmed and the original destroyed. The company considers the information recorded by the computer on magnetic tape as the permanent records of the history of the customer accounts. The information is received by the home office daily and processed and fed into the machine in the ordinary course of business.
King contends that the computer sheets do not meet the requirements of the shop book rule because the sheets are not the original records, citing, Fatherree v. Griffin, 153 Miss. 570, 121 So. 119 (1929), where the court held inadmissible a sworn itemized statement of account without producing the books from which the account was made, holding that the books were the best evidence. King also contends that the first permanent record of the customer account is maintained in the branch office, that is, a copy of the "receipt blocks", the original of which is forwarded to the home office.
We find it unnecessary to discuss the "shop book" rule as applied to conventional bookkeeping methods.[1] We are of the opinion that the chancellor was justified in finding that the records of customer accounts maintained by Murdock would meet the requirements of the shop book rule if conventional books were used instead of a computer. The problem is whether the sheet printed out by the computer is inadmissible because it is not the original record under the rule announced in Fatherree v. Griffin, supra, or whether the court should adapt the rule formerly applied to conventional books so as to accommodate the changes involved in electronic data processing. This change has been accomplished by statute in a number of states by adoption of the Uniform Business Records as Evidence Act; however, this Court is not dependent upon legislative action to determine the question before us. The rules of evidence governing the admission of business records are of common law origin and have evolved case by case, and the Court should apply these rules consistent with the realities of current business methods. The law always seeks the best evidence and adjusts its rules to accommodate itself to the advancements of the age it serves. Our decision in this case was foreshadowed in Grenada Cotton Compress Co. v. Atkinson, 94 Miss. 93, 47 So. 644 (1908), when this Court extended the shop book rule by holding that where an entry is made by one person in the regular course of business recording an oral or written report made to him by one or more other persons in the regular course of business of a transaction lying in the personal knowledge of the latter there *398 is no objection to receiving that entry, provided the practical inconvenience of producing on the stand the numerous persons thus concerned would in the particular case outweigh the probable utility of doing so. In so holding, the Court, quoting from Wigmore said:
It would seem that expedients which the entire commercial world recognize as safe could be sanctioned, and not discredited, by courts of justice. When it is a mere question of whether provisional confidence can be placed in a certain class of statements, there cannot profitably and sensibly be one rule for the business world and another for the courtroom. The merchant and the manufacturer must not be turned away remediless because methods in which the entire community places a just confidence are a little difficult to reconcile with technical judicial scruples on the part of the same persons who, as attorneys, have already employed and relied upon the same methods. In short, courts must here cease to be pedantic and endeavor to be practical." (94 Miss. at 100, 101, 47 So. at 646; See also 5 Wigmore, § 1530 (3d ed. 1940).
Transport Indemnity v. Seib, 178 Neb. 253, 132 N.W.2d 871, 11 A.L.R.3d 1368 (1965), was decided on the Uniform Business Records as Evidence Act and the Court said that no particular form of record was required. The Uniform Act does not mention computers or electronic machines. In an annotation following Seib it is stated:
The progostication seems justified that as business records kept electronically become increasingly prevalent, the legal problems in connection with their use in evidence will resolve themselves into the question whether the proof offered by the litigant seeking receipt of such records in evidence, as to the manner in which they were prepared and kept, is sufficient to satisfy the pre-electronics requirements as to the admission of business records prepared and kept in conventional forms (journals, ledgers, reports, etc.); that is to say, has it been sufficiently shown that the records kept or stored electronically were made in the regular course of business, that they were based on information within the personal knowledge of one whose duties included the collection of such information, that the records themselves were prepared by those who understood the operation of the equipment and whose regular duty it was to operate it, etc. The only case dealing with the problem at the time this annotation was prepared seems to justify the foregoing speculation. (11 A.L.R.3d at 1378).
In Jones on Evidence, Fifth Ed., Section 609 (Supp. 1968) it is said that "[T]he scientific reliability of such machines [electronic computing equipment], in the light of their general use and the general reliance of the business world on them, can scarcely be questioned."
Records stored on magnetic tape by data processing machines are unavailable and useless except by means of the print-out sheets such as those admitted in evidence in this case. In admitting the print-out sheets reflecting the record stored on the tape, the Court is actually following the best evidence rule. We are not departing from the shop book rule, but only extending its application to electronic record keeping.
In sum, we hold that print-out sheets of business records stored on electronic computing equipment are admissible in evidence if relevant and material, without the necessity of identifying, locating, and producing as witnesses the individuals who made the entries in the regular course of business if it is shown (1) that the electronic computing equipment is recognized as standard equipment, (2) the entries are made in the regular course of business at or reasonably near the time of the happening of the event recorded, and (3) the foundation testimony satisfes the court that the sources of information, method and time of preparation were such as to indicate its trustworthiness and justify its admission.
*399 We are not to be understood as indicating that computer evidence is infallible. Its probative value is the same as conventional books, and it is subject to refutation to the same extent.
We are therefore of the opinion that the chancellor was correct in all his rulings and his decree is affirmed.
Affirmed.
All Justices concur.
NOTES
[1] For a comprehensive study of the "shop book" rule see Business Entries in Mississippi, 16 Miss.L.J. 266 (1944).