THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MICHAEL MORMON, Defendant-Appellant.

First District (1st Division)    No. 80-121

Opinion filed June 15, 1981.

Susan Kaplan, of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

The defendant, Michael Mormon, was charged by information with armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 18—2), rape (Ill. Rev. Stat. 1977, ch. 38, par. 11—1), deviate sexual assault (Ill. Rev. Stat. 1977, ch. 38, par. 11—3), and two counts of armed violence (Ill. Rev. Stat. 1977, ch. 38, par. 33A—2), one based on rape and the other on armed robbery. After opening arguments, the defendant moved to strike both counts of armed violence. The trial court struck the count pertaining to the armed robbery. Following a bench trial, the defendant was convicted of armed robbery, rape, deviate sexual assault, and armed violence based on rape. He was sentenced to 20 years for rape, 15 years for armed robbery, 20 years for armed violence, and 25 years for deviate sexual assault.

The defendant argues on appeal that: (1) the trial court erroneously admitted into evidence a facsimile of a computer-generated contract as it failed to fall within the business records exception to the hearsay rule; and (2) that he was erroneously convicted and sentenced on both the rape and armed violence charges because both arose from the same physical act. We affirm in part and reverse in part.

The complainant testified that on March 7, 1978, she returned home to her high-rise apartment building between 4:30 and 5 p.m. and took the elevator to her apartment. Before the elevator reached her floor a man entered the elevator and rode up to her floor with her. The man carried a cardboard box and informed her that he was selling candy for charity. When the elevator reached her floor the complainant and the man exited. The man began knocking on her neighbor's doors, however, when the complaining witness unlocked her door, the man held a pistol to her back and ordered her to enter the apartment. Once inside the apartment the

man took the complainant's wallet, credit cards, one of which was a Visa card with account number 4678-7700-38973, check-cashing cards, and a leather coat. He then took her into her bedroom where he first forced her to commit an act of oral sex with him and then intercourse. Before leaving the apartment, the defendant tied the complainant's hands behind her with a telephone cord. After freeing herself, she contacted the building security guards who contacted the police. During the incident, which covered approximately 45 minutes, the complainant had the opportunity to view the defendant, although the only light on in the apartment was in the bathroom, because it was just becoming dusk and each room had windows covered only with sheer drapes. It was stipulated that medical testimony confirmed the fact that the complainant had been raped.

Immediately after the incident the complainant described her assailant to the police as a 24-year-old black man with a moustache and black straightened hair. From March 7, 1978, to September 20, 1978, the complainant viewed police photographs and attended a police lineup. She made no identifications however. Then on September 20, 1978, she identified the defendant from one of a group of photographs brought to her place of employment by a police investigator. She again identified the defendant on September 22, 1978, in a lineup conducted at the Area 1 police station.

Police Officer Robert Fields, an investigator for the Chicago Police Department, testified for the State that he was assigned to investigate this case and that incident to that assignment he interviewed the complainant within a few days of the incident. While he could not remember whether the complainant told him that her assailant weighed about 140 pounds, he did think that she told him that her assailant was between 5'4" and 5'7", had black hair, and was between the age of 17 and 24. Officer Field's police report failed to indicate that the complainant gave a description of the offender's hair or eye color or a description of his facial characteristics. Officer Field also testified that he brought photographs to the complainant's apartment and also had her look at high school yearbooks. She made no identifications from any of these photographs. Michael Mormon's photograph was not included among these photographs. On September 19, 1978, according to Officer Field's testimony, he received a fingerprint card with the name Nahid Saadiq from the Lombard Police Department and gave that to the Chicago Police Department Bureau of Identification which in return provided him with a photograph. He and his partner took that photograph along with seven others to the complainant on September 20, 1978, and she identified one of the photographs as that of her assailant. Following this identification Fields arrested Michael Mormon.

Officer Pruim from the village of Broadview Police Department testified that on March 11, 1978, after monitoring a radio broadcast, he stopped a tan Cutlass with a license plate number AV 4701 and took a man and a woman into custody. The woman identified herself as Terry Foster, and the man identified himself as Nahid Saadiq. All of the information received from the man came from the driver's license he provided. Subsequent to his arrest, the man was turned over to the Lombard Police Department. Therefore, he was neither photographed nor fingerprinted by the Broadview Police Department. Officer Pruim identified the defendant Michael Morman as the man he arrested on March 11, 1978, who had identified himself as Nahid Saadiq. Officer Pruim testified that the man he arrested on March 11, 1978, from the car bearing license plate AV 4701, and the man known in the instant case as Michael Mormon, were one and the same. His testimony was corroborated by the testimony of a Chicago fingerprint technician who compared fingerprints taken by the Lombard police of Nahid Saadiq and prints taken of Michael Mormon and found them identical.

Two witnesses testifying for the State identified a Texaco sales invoice which revealed that on March 8, 1978, a Visa card in complainant's name bearing card number 4678-7700-38973 was used to purchase $14.60 worth of gasoline at William's Texaco located at 75th and Jeffery in Chicago. The invoice contained the license plate number of the party purchasing the gas; however, the number was not totally clear on the Visa copy of the invoice. The license plate number was clear, however, on the Texaco copy of the invoice and indicated that the gasoline was purchased for a car bearing the license plate AV 4701. Neither witness had been at the gasoline station in question at the time of the transaction nor had either talked to the attendant who had sold the gas, so neither knew anything concerning the party who purchased the gas with the complainant's Visa card.

Also testifying for the State was Joseph Miller, security manager for Avis Corporation. Mr. Miller's duties were to provide security for the rental vehicle fleet and the corporate locations and to obtain documents necessary for investigations conducted concerning lost or stolen cards. His testimony was the subject of a motion *in limine* denied by the trial court regarding the introduction of any evidence relating to an Avis Rent-A-Car in which Michael Mormon was allegedly a passenger. He identified People's Exhibit Number 6 as a facsimile of an Avis rental agreement pertaining to the rental of an Avis automobile bearing Illinois License number AV 4701 and paid for by complainant's Visa card number 4678-7700-38973. The facsimile indicated that the rental occurred on March 8, 1978, one day after the alleged armed robbery and sexual assault of the complainant. Miller explained that the information on the rental agree-

ment was obtained in the regular course of business and that it is in the regular course of business for Avis to keep such information. According to his testimony, the information on the form was collected by the rental agent from the lessee at the time the vehicle was rented. The information was then simultaneously entered on a form rental agreement and into the computer by use of the computer's console typewriter. Avis keeps the original of the written agreement and gives the other copies to the customer. The computer holds the information from the rental agreement for about six months and then the information is converted to microfilm which is stored at the Avis headquarters in New York. Mr. Miller testified that he looked for the original of the rental agreement, and when he was unable to find it ordered the facsimile to be made from the information stored on the microfilm. The facsimile of the agreement was not signed but did indicate that the signature was on file.

Defense counsel objected to the introduction of this evidence on the grounds that it violated the best evidence rule in that it was not made in the regular course of business but rather prepared at the request of the witness, that the document was hearsay, and because there was no foundation for showing that the defendant was connected to the car or the rental agreement. The objection was overruled and the document was admitted into evidence.

Officer Gertha Booth was called to testify for the defense. She interviewed the complainant on the night of the incident and accompanied her to the hospital. She was told by the complainant that her assailant was a black, 5'7", 140-pound male of about 24 years of age with a moustache and black straight hair. During the interview the complainant was nervous, upset, and hysterical.

The defendant testified in his own behalf that he was 5'11" and 160 pounds. He denied that he was at 4250 South Lake Park on March 7, 1978, that he raped or robbed the complainant, or that he had ever seen her prior to the lineup of September, 1978. He testified that he had a goatee and a moustache on March 7, 1978. His testimony regarding whether he wore his hair straight on this date was contradictory.

As to the events of March 11, 1978, the defendant testified that he was picked up in the morning by his friend Diane Thunderbird and that they went to Lombard. While in Lombard, they stopped at a Jewel grocery store. To his knowledge his friend was not also known as Terry Foster. He and his friend were heading back to Chicago from Lombard when he was arrested and taken first to the Broadview police station and then to the Lombard police station. When he was arrested the police officer took information from a driver's license belonging to his friend, Nahid Saadiq. They did not ask him his name and he signed the name appearing on the paper that they gave him and on a fingerprint card. The defendant further

testified that in September 1978, he was arrested by Officer Field and taken to the police station and fingerprinted. On cross-examination he denied telling Officer Field that he was not arrested on March 11, that he told Field that a friend, Pete Martin, was the person arrested with Diane Thunderbird, or that he was 5'9" and weighed 150 pounds. He denied ever seeing the complainant's checkbook or credit cards or sending them back to her. He did admit that he was placed in a lineup on September 22, 1978.

Diane Thunderbird testified that she had known the defendant and had a child by him. She said that from the time she first met him until October 1978, when he had an operation, the defendant had a noticeable limp from an accident. Ms. Thunderbird testified that on March 11, 1978, she picked up the defendant in an orange car that had been given to her by a friend named Adrian who was now in the penitentiary. While she only assumed that Adrian had rented the car, she knew defendant did not have anything to do with renting the vehicle. She and defendant drove to the Jewel store in Lombard. She was the driver. On cross-examination, over defense objection, she identified a check made out to an Ann Riley and stated that she had endorsed that check and cashed it on March 11, 1978. The check, number 5218, was given to her by her friend Adrian and was drawn by Marine Sales. It was the only check given to her by Adrian. She did not receive any credit cards from Adrian. The witness was then shown a second check drawn by Marine Sales numbered 5234 and made out to complainant. The witness denied ever seeing this check and stated that she had not endorsed it. She did not see defendant in possession of any credit cards issued to complainant and never saw or was in possession of any credit cards belonging to complainant.

The defendant's first argument is that People's Exhibit Number 4 was erroneously admitted as a facsimile of an Avis Rent-A-Car rental agreement and that this error constituted reversible error because it was the only link between the defendant and the complainant's stolen property. It is the defendant's position that the facsimile did not meet the statutory requirements of the Criminal Code's business records exception to the hearsay rule (Ill. Rev. Stat. 1977, ch. 38, par. 115—5). The defendant further contends that the testimony of Miller was insufficient to lay the foundation required for the admission of a computer-generated business record.

Section 115—5 provides:

"(a) *Any writing or record*, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in *regular course of any business, and if it was the regular course of such business to make such memorandum or record* at the time of such

act, transaction, occurrence, or event or within a reasonable time thereafter.

All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

The term 'business,' as used in this Section, includes business, profession, occupation, and calling of every kind.

(b) If any business, institution, member of a profession or calling, or any department or agency of government, in the regular course of business or activity has kept or recorded any memorandum, writing, entry, print, representation or combination thereof, of any act, transaction, occurrence, or event, and in the regular course of business has caused any or all of the same to be recorded, copied, or reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic, or other process which accurately reproduces or forms a durable medium for so reproducing the original, the original may be destroyed in the regular course of business unless its preservation is required by law. Such reproduction, when *satisfactorily identified*, is as admissible in evidence as the original itself in any proceeding whether the original is in existence or not and an enlargment or *facsimile of such reproduction is likewise admissible in evidence if the original reproduction is in existence and available for inspection under direction of court.* The introduction of a reproduced record, enlargment, or facsimile does not preclude admission of the original. This Section shall not be construed to exclude from evidence any document or copy thereof which is otherwise admissible under the rules of evidence.

(c) No writing or record made in the regular course of any business shall become admissible as evidence by the application of this Section if:

> (1) Such writing or record has been made by anyone in the regular course of any form of hospital or medical business; or
> (2) Such writing or record has been made by anyone during an investigation of an alleged offense or during any investigation relating to pending or anticipated litigation of any kind." (Emphasis added.)

The defendant contends that the instant facsimile is not a reproduction under section 115—5(b) because it was not "satisfactorily identified" and because it was not created in the regular course of business but rather created at the request of the Assistant State's Attorney for this trial.

The defendant also contends that the admissibility of the facsimile rests on the requirement that the original records be available for inspection and that here that requirement was not met because the original written contract could not be found.

The defendant's arguments evidence some confusion over the three types of business records covered by section 115—5: the original business record, the reproduction, and the facsimile. In the instant case, the testimony of Joseph Miller, the Avis employee, revealed that two original business records were made and kept in the regular course of business for any Avis car rental agreement: the original written record and the original computer record. Carbon copies of the original written agreement, according to the testimony of Miller, are given to the customer as his copies. As such, the only reproduction of the original records retained by the company is the microfilm copy of the original computer record. Miller testified that such microfilm copies were made in the regular course of business and then stored in the New York office in lieu of retaining the computer record. The instant facsimile, according to his testimony, was created by making a copy of the microfilm entry of this transaction and then placing the information contained thereon on a blank car rental agreement form.

■■ After reviewing the record and the provisions of section 115—5, we reject the defendant's contention that the facsimile was erroneously admitted because it was not "satisfactorily identified." As already noted, a facsimile is not a reproduction under section 115—5(b), and therefore, it was not necessary that it be "identified." Nor do we accept defendant's assertion that the facsimile was not admissible in that the original written contract was not available. Under this section, a facsimile is admissible if the original reproduction is in existence and available for inspection under direction of the court. It is undisputed that here the microfilm, the original reproduction, is in existence and subject to inspection upon demand.

The defendant also maintains that the facsimile was inadmissible because it was created incident to the trial and not in the regular course of business as required by section 115—5. The business records exception to the hearsay rule, whether applied at a civil or criminal trial, is premised on the concept of routineness. The credibility of any business record depends upon the regular, prompt and systematic nature of the entry and the fact that it is relied on in the operation of a business. *Terminal-Hudson of Illinois, Inc. v. Goldblatt Brothers, Inc.* (1977), 51 Ill. App. 3d 199, 366 N.E.2d 486; *Ocasio-Morales v. Fulton Machine Co.* (1973), 10 Ill. App. 3d 719, 295 N.E.2d 329; 2 Jones on Evidence §§12:1; 12:11 (6th ed. 1972); Annot., 71 A.L.R.3d 232 (1976); 30 Am. Jur. 2d *Evidence* §937 (1967).

■■ Section 115—5(c)(2) codified an exception to the common law "shop records rule" which recognizes that business records made in anticipation

of litigation or during the pendency of litigation do not possess the same trustworthiness as records which are prepared at a time when there is no motivation to falsify. A plain reading of this subsection within the context of the entire section and consideration of the policies behind the development of the business records rule as required by the rules of statutory construction (*People v. Bratcher* (1976), 63 Ill. 2d 534, 349 N.E.2d 31; *Walker v. Alton Memorial Hospital Association* (1980), 91 Ill. App. 3d 310, 414 N.E.2d 850) strongly supports the conclusion that this subsection applies solely to original business records. Reproductions or facsimiles prepared incident to or in anticipation of litigation but which are based upon an original record made and kept in the regular course of business are not subject to this section because their trustworthiness is based upon the original record. *Transport Indemnity Co. v. Seib* (1965), 178 Neb. 253, 132 N.W.2d 871.

■■ In the instant case, the admissibility of the facsimile was based on the original computer record as preserved on microfilm. It is undisputed in the record that both the computer record and the microfilm were made in the regular course of business and that it was the regular course of business to keep such records. The facsimile was created as a convenient substitute for the microfilm which apparently listed the information from the computer record while the facsimile reproduced the information onto an Avis car rental agreement making the information easier to understand. We do not believe that section 115—5 should be narrowly interpreted to prohibit the use of a facsimile which utilizes a different visual format than the original reproduction as long as the information on the facsimile is accurate. If the defendant has any doubt of the authenticity or the accuracy of the information contained in the facsimile, then under section 115—5(b), he could have requested the trial court to allow an examination of the "original reproduction." This action was not taken.

■■ We next consider the defendant's argument that the facsimile was inadmissible because the proper foundation for its admission was not laid. The admissibility of computer-generated records has been addressed by few courts throughout the United States; however, it has been established in Illinois that computer records may be admitted into evidence in either civil or criminal cases as long as a proper foundation has been established. (*Grand Liquor Co. v. Department of Revenue* (1977), 67 Ill. 2d 195, 376 N.E.2d 1238; *People v. Boyd* (1978), 66 Ill. App. 3d 582, 384 N.E.2d 414; *Department of Mental Health v. Beil* (1976), 44 Ill. App. 3d 402, 357 N.E.2d 875.) In *Grand Liquor Co.*, our supreme court adopted a rule set forth in *King v. State ex rel. Murdock Acceptance Corp.* (Miss. 1969), 222 So.2d 393, that a proper foundation for the admissibility of computer-generated records is established where the evidence shows: (1) that the electronic computing equipment is standard; (2) the entries are made in

the regular course of business at or near the time of the transaction or event recorded; and (3) the sources of information, method and time of preparation were such as to indicate its trustworthiness and justify its admission. In deciding to accept the *King* foundation criteria, our supreme court considered the possible types of problems inherent in the use of computer-generated records that would affect their credibility and recognized that:

> "Three potential sources of error underlie a computer record-keeping, data-processing system: 'the input of information by encoding or translating it [source documents] into machine language, the creation of the program which instructs the computer, and the actual mechanical operation of the machine.' (Tapper, *Evidence from Computers*, 8 Ga. L. Rev. 562, 566 (1974).)" (67 Ill. 2d 195, 199.)

See generally Tapper, *Evidence from Computers*, 8 Ga. L. Rev. 562 (1974); Roberts, *A Practitioner's Primer on Computer-Generated Evidence*, 41 U. Chi. L. Rev. 254 (1974).

The defendant maintains that the requisite foundation was not provided by the State because the testimony of Miller failed to establish that the Avis electronic computing equipment was standard and because there are questions as to the source of the information supplied and the method of its preparation which undermine the facsimile's trustworthiness. The decisional law in this area gives little guidance in determining the type or amount of evidence to show that a computer is standard. In each of the Illinois decisions which have addressed this issue (*Grand Liquor Co. v. Department of Revenue*; *People v. Boyd*; and *Department of Mental Health v. Beil*) there was a complete failure to bring in evidence as to the operation, capability or accuracy of the computer involved. In *King v. State ex rel. Murdock Acceptance Corporation* (1969), 222 So.2d 393, the witness who established the foundation for the computer-generated records testified that the equipment was standard, efficient, and accurate and then explained its operation at great length.

In the instant case there was no evidence of any unreliability of the Avis computer. Indeed, its reliability seems apparent from the fact that the facsimile contained information consistent with other evidence in the record and in particular the complainant's testimony concerning her Visa card. While Miller did not specifically testify as to the standard nature of accuracy of the Avis computer, we believe that there was sufficient evidence from which the trial court could have concluded that the computer was standard and accurate. As indicated, the accuracy of the computer was verified by the consistencies between the record and the computer-generated record as distinguished from the circumstances in *Grand Liquor Co. v. Department of Revenue* and *People v. Boyd*. More-

over, there was extensive testimony by Miller concerning the method and manner of obtaining and recording information relating to rental transactions. Some of this testimony included a period in which the trial court questioned the witness in order to clarify flaws in his understanding of the Avis computer and its operation.

■█ The very nature of the Avis computer also increased the probability of the reliability of the records it generated. The use of a console typewriter to feed data into the computer instead of data processing cards and the simultaneous recording of information on the car rental agreement form and its entry in the computer reduced the probability of error through human handling. (Roberts, *A Practitioner's Primer on Computer-Generated Evidence*, 41 U. Ch. L. Rev. 254 (1974).) Indeed, as the court recently noted in *People v. Gauer* (1972), 7 Ill. App. 3d 512, 514, 288 N.E.2d 24,

> "In the light of the general use of electronic computing and recording equipment in the business world and the reliance of the business world on them, the scientific reliability of such machines can scarcely be questioned."

Moreover, we believe that the fact that the Avis computer was used to retrieve information rather than perform calculations necessitates less scrutiny into the nature of the computer. Accordingly, we believe the trial court properly determined that the facsimile was admissible.

■█ In so concluding, we emphasize that the instant business record was admitted for the limited purpose of showing that a car was rented on March 8, 1978, with complainant's Visa card number 4678-7700-38973. While this evidence in conjunction with the testimony of the complainant and the fact that the defendant was arrested on March 11, 1978, while riding in the car rented with the complainant's Visa supports an inference that the defendant was guilty of the armed robbery, the record is sufficient without this testimony to support the defendant's convictions. The complainant made an out-of-court lineup identification and an in-court identification. The lineup identification was not weakened by the fact that it was made approximately six months after the incident. (*Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375; *People v. Rodgers* (1972), 53 Ill. 2d 207, 207 N.E.2d 251.) The complainant saw her attacker for over 45 minutes at close range in at least adequate lighting. Moreover, the complainant made no previous identification at any of the photographic showings prior to identifying the defendant so that her record for reliability was good. We think the record supports the conclusion that the testimony of the complainant was clear and convincing. Such testimony is sufficient to support a conviction even if the facsimile was not admissible. Moreover, additional evidence in the record exists to support the convictions in the testimony concerning the two

Marine Sales checks and the testimony concerning the use of the Visa card to buy Texaco gasoline for the car in which the defendant was arrested.

■■ The defendant next argues under the authority of *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273, that he may be convicted and sentenced on only the more serious of the armed violence charge and the rape charge because both charges arose from the same physical act. The defendant properly relies on *King* for the proposition that where a defendant is convicted of two offenses and both offenses arise from the same physical act, a conviction may be entered on only the most serious of the two offenses. In applying this general proposition to the present case we note that courts which have recently addressed this question have held that only a single conviction and sentence may be imposed on an armed violence charge and its underlying offense because only one physical act has occurred. (*People v. Jones* (1981), 93 Ill. App. 3d 475; *People v. Crawford* (1980), 90 Ill. App. 3d 888, 414 N.E.2d 25; *People v. Jones* (1980), 89 Ill. App. 3d 1030, 412 N.E.2d 683.) Here, evidence of the defendant's single act of having intercourse with complainant at gunpoint provides the necessary proof of the elements of both charges. Moreover, the defendant's conduct was not clearly divisible into two offenses as there was no time that one offense was complete before the other commenced. (*People v. Johnson* (1970), 44 Ill. 2d 463, 256 N.E.2d 343, *cert. denied* (1970), 400 U.S. 958, 27 L. Ed. 2d 266, 91 S. Ct. 356; *People v. Burks* (1975), 29 Ill. App. 3d 74, 331 N.E.2d 581.) Consequently, we agree that one of these convictions must be vacated. Because we find that the armed violence is the less serious of the two offenses, we vacate the armed violence conviction.

For the foregoing reasons the judgment of the circuit court of Cook County finding the defendant guilty of rape, deviate sexual assault, and armed robbery is affirmed, but the judgment for armed violence is vacated.

Affirmed in part, vacated inpart.

GOLDBERG and O'CONNOR, JJ., concur.