THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOSE RIVERA, Defendant-Appellant.

First District (2nd Division)   No. 1—87—2951

Opinion filed April 4, 1989.

Mitchell D. Kreiter & Associates, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Marie Quinlivan Czech, and Linda S. Halperin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN* delivered the opinion of the court:

The defendant was found guilty by a jury of two counts of possession of a controlled substance with intent to deliver and sentenced to concurrent terms of nine years and six months on one count and seven years on the other. He contends that various errors in the admission of evidence require a new trial.

On April 8, 1986, at approximately 1 p.m., eight Chicago police officers executed a search warrant authorizing the search of the premises at 747 North Throop Street, rear house, Chicago, Illinois. The officers, under the direction of Sergeant James McGovern, arrived at a gangway near the alley running along the rear yard of the residence and set up surveillance. They were waiting for someone to be let into the residence because of the physical layout, which included a 10-foot wall running along the alley bordering the rear house. A short while later, Tony Nieves approached the door in the wall, and the defendant let him in. Nieves entered quickly, and the door slammed shut. Officer Robert Kocan shouted "Stop, police." He and Officer Higgins attempted to jar the door open with their shoulders. When this attempt, as well as a subsequent blow with a sledge hammer, proved ineffective, Higgins was boosted to the top of the wall, where he found a two-by-four with nails protruding. Higgins testified that while he was on the wall, the defendant came out of the rear building, threw an ashtray at him and went back into the building.

Once Higgins was over the wall, he let the other officers in through the door in the wall. The officers proceeded to the only door to the single-level brick building located in the rear of the yard. When their orders to open the door were met with no response, the officers knocked the door open with the sledge hammer.

Kocan, first through the door with Higgins, saw the defendant, his younger brother and Tony Nieves in the kitchen. The defendant was standing near the sink, and a triple-beam scale was on the top of the kitchen table.

Sergeant McGovern searched the defendant and recovered three pieces of identification: a voter's registration card in the defendant's name listing his residence as 747 North Throop; a traffic ticket with

---

*Justice Egan participated in this opinion prior to his assignment to the sixth division.

the same address; and a bond slip dated February 5, 1986, for a battery offense which also listed the defendant's address to be 747 North Throop.

Kocan recovered a camera case from the top of a portable television on the dresser in the rear bedroom. The case contained 11 clear plastic bags of suspected narcotics and $1,135.

Officer Schulz recovered a large, clear plastic bag of suspected cocaine from the bottom shelf of the medicine cabinet in the bathroom. Also discovered were three loaded pistols, a grinder used to cut cocaine and plastic bags used to package narcotics. The defendant, his brother and Tony Nieves remained in the kitchen during the search. Kocan testified that the defendant's two-year-old son was also present.

It was stipulated that a forensic chemist performed tests on the substances recovered during the search and that the tests revealed 516 grams of cocaine and 7.04 grams of phencyclidine, a controlled substance, more commonly referred to as PCP.

Before trial, the defendant filed a motion *in limine* as to rent receipts and the search warrant. Over objection, the judge ruled that the State would be allowed to introduce evidence that the police had a search warrant legally authorizing them to search the premises of the rear house and the defendant, but he granted the request that the defendant not be referred to as "Lefty" in the presence of the jury. The State did not offer the rent receipts at the trial.

The defendant also argued against the admission of two bond slips: one for the underlying offense for which he was to be tried and one for the unrelated battery that was recovered from the defendant during the search. The trial court ruled that the bond slip for the battery offense listing the defendant's address as 747 North Throop and dated February 5, 1986, could be introduced. The defendant and State stipulated that he gave the address 747 North Throop on the bond slip for the underlying offense so that the jury would not see that he posted $4,500 for bail.

The defendant first contends that the judge committed reversible error when he permitted the bond slip for the unrelated battery to be admitted into evidence in light of the other evidence available listing his address as 747 North Throop.

The State responds that the judge properly allowed the bond slip to be introduced to show a material fact—that the defendant had previously admitted that 747 North Throop was his residence address—and that any prejudicial effect that might have been caused by the bond slip's introduction was prevented when the judge ordered that

the word "battery" on the bond slip be changed to "misdemeanor."

■ Whether to permit evidence from which a jury could infer that a defendant had been guilty of other criminal conduct is within the discretion of the court, assuming that the evidence tends to establish any fact material to the prosecution, *e.g.*, identity, motive, general scheme or plan. One of the principal material facts in this case was the residence of the defendant. In that regard, the bond slip was probative to "identify" the defendant as a resident of 747 North Throop. But so also were the traffic ticket and the voter registration card, which established precisely the same thing: that he held himself out to be a resident of 747 North Throop. The bond slip for the underlying offense was also offered for that purpose. In addition, the State had ready, and did use, other evidence which we will discuss later: testimony of Officer Kocan that the defendant told him his address was 747 North Throop and records of Illinois Bell Telephone Company (Illinois Bell) establishing the same thing, but in more detail.

The trial judge recognized that the evidence might be cumulative, and he also recognized that it could be prejudicial:

> "Otherwise, especially since it's only a misdemeanor battery charge, it's not a drug case, it's not a felony, like attempt murder or kidnapping or rape or something. I really don't think it is that prejudicial even if it is as you suggest, Mr. Kreiter [defense counsel], cumulative."

■ In our judgment the introduction of the bond slip was an abuse of discretion, but we do not believe that it constituted reversible error. Two officers testified that a "bond slip" was recovered from the defendant. The exhibit was identified only as a bond slip. The record does not reflect what exhibits did go to the jury. The judge would not permit the arrest reports to go to the jury. When he asked the defendant's attorney if there was any objection to any exhibits going to the jury, the attorney made no response. We infer, therefore, that the bond slip did not go to the jury. Consequently, the jury knew only that a bond slip had been recovered. They did not know that it was for an arrest for a battery or a misdemeanor. And if they did, any prejudice would be minimal in view of the evidence of guilt.

The defendant next contends that his motion for mistrial was improperly denied after Officer Garcia referred to him by his nickname "Lefty" in violation of the trial court's prior ruling on his motion *in limine*. During cross-examination of Garcia, the following occurred:

> "DEFENSE ATTORNEY: Who was in the kitchen?

GARCIA: My sergeant, four people.

Q. What other people?

A. Lefty was in in [*sic*].

STATE'S ATTORNEY: Objection. We ask leave to approach the bench."

Outside the presence of the jury, the judge instructed the defendant's attorney to rephrase his question to ask specifically who was in the kitchen and if they were in court. The defense attorney decided against further inquiry into the matter after resuming his cross-examination. Two other officers testified after Garcia, and it was not until after the completion of the testimony of the last officer that the defendant made a motion for a mistrial.

■ It is the general rule that objections must be timely; otherwise, any error is waived. (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.) There seems no reason why the same rule should not apply to motions for a mistrial. The court could have corrected any error by instructing the jury to disregard the answer. No request for such an instruction was made. Any possible error, therefore, was waived. *People v. Winfield* (1983), 113 Ill. App. 3d 818, 447 N.E.2d 1029.

■ But waiver aside, we do not believe the remark by Garcia may be elevated to the status of reversible error. The trial court had previously ruled that he would permit proof that the police had a search warrant for the premises and the defendant but he would not permit the contents of the search warrant to be read to the jury. The search warrant named "Lefty," but the jury was not aware of that. Garcia testified that four others were in the kitchen. Insofar as the jury was concerned, "Lefty" was not necessarily the defendant. Even if the jury did conclude that "Lefty" was the defendant, the inadvertent deviation from the *in limine* order was harmless.

■ The defendant also argues that the trial judge committed reversible error when he permitted testimony that the police had a search warrant authorizing the search of the premises at 747 North Throop, rear house, Chicago, Illinois, as well as the defendant's person. He argued that the search warrant was a hearsay document. We disagree. The trial judge clearly stated that he was allowing the police officers to testify, not to the contents of the search warrant, but merely to show the officers' legal authorization to conduct such a search. The judge wanted to prevent the inference that the tactical team acted in "gestapo" or illegal fashion. The evidence was properly admitted for the limited purpose of explaining the conduct of the police officers. *People v. Hunter* (1984), 124 Ill. App. 3d 516, 464

N.E.2d 659; *People v. Jones* (1983), 114 Ill. App. 3d 576, 449 N.E.2d 547.

The defendant's next contention is that the court erred in the introduction of Illinois Bell telephone records. An understanding of the significance of those records requires a more detailed recitation of the evidence. There are two buildings located at 747 North Throop. The front building is two stories; the rear building is one. The search warrant was issued for the rear building; the defendant was arrested and the narcotics were recovered in the rear building.

The only witness for the defense was the defendant, who testified as follows: His true residence was 747 North Throop, second floor, front building, where he had resided with his parents for approximately the last 9 to 10 years. The wall between the two residences existed at the time the defendant moved in. Henry Santiago lived in the rear house and had been there since 1983.

On April 8, 1986, he overslept and missed his court call at traffic court. He decided to go to Santiago's residence to use his phone to arrange a new court date, because he did not have a phone in his home. At approximately 11 a.m. he took his son and little brother with him to Santiago's residence at the rear. After making the phone call, he watched video tapes with Santiago and an unknown female for about a half hour.

Santiago and his female guest departed; however, Santiago allowed the defendant and his family members to stay and watch video tapes. A short while later, Tony Nieves arrived at the back gate, and the defendant let him in to wait for Santiago. He did not order a telephone in his name in the rear house, and none of the police officers ever asked him where he lived. He had seen Santiago several times since his arrest.

It should be kept in mind that the exhibits recovered from the defendant, the bond slips, voter registration card and the traffic ticket, show his address to be only 747 North Throop; they are not inconsistent with his testimony. Further, although Officer Kocan testified that the defendant told him he lived in the rear building, the defendant denied that anyone asked him where he lived. Therefore, any independent evidence from which the jury could infer that the defendant exercised dominion and control over the rear premises and which contradicted his testimony would greatly enhance the State's case. The telephone records were such evidence.

Merny Miller testified that she was the keeper of the records for Illinois Bell and had been so employed for 11 years. She had testified in court many times, 24 times in the last year. She was familiar with

the manner in which records were kept regarding billing information. The bill face record was one of the exhibits and showed when the service was established, where the bill was sent, the date of the initial installation, the "treatment history" for the last 12 months, whether the telephone had been disconnected for nonpayment and whether any bad checks had been received in payment.

She said that the records showing customer usage and service are stored in computers that are "standard and reliable." IBM is the standard computer that Illinois Bell uses and had been using for billing information purposes for all the years that she had worked there. The exhibits were "generated off the computer." Based upon her experience as keeper of the records, she testified that the input documentation was put in the computer at the time the information was received.

When she was describing changes, for example, a change of a telephone number, she was asked, "Once those items are changed is the information then put in the computer that you have described earlier that Illinois Bell uses?" She answered that it was. All of the records were kept in the ordinary course of business.

The records established that service began on October 1, 1984, under telephone number 421-1007, that it was changed to 666-8984 ten days after the defendant's arrest, and that service was disconnected on June 5, 1987. All records establish that the subscriber was Jose Rivera at 747 North Throop, *rear*.

The defendant's objection to this evidence is based on two grounds: he alleges that the evidence was prepared in anticipation of litigation and thus was inadmissible under section 115—5(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 115—5(c)); and he argues that no proper foundation was established.

Section 115—5(c) of the Criminal Code (Ill. Rev. Stat. 1985, ch. 38, par. 115—5(c)) provides in relevant part:

> "(c) No writing or record made in the regular course of any business shall become admissible as evidence by application of this Section if:
> 
> \*\*\*
> 
> (2) Such writing or record has been made by anyone during an investigation of an alleged offense or during any investigation relating to pending or anticipated litigation of any kind."

The defendant points out that the records were obtained from Illinois Bell in compliance with a subpoena issued in January 1987, over eight months after the date of the execution of the search warrant and his arrest. He contends that the records clearly were prepared

solely for use at his trial and that it was error to admit them into evidence.

Miller testified that the input documentation was put in the computer at the time the information was received. Hence, the records, or more precisely, the information composing the records, were always stored in the computers at or near the time they were made and not created or prepared in January 1987. The exhibits that were received in evidence were retrieved from, or generated by, the computers and, as such, are similar to facsimiles of records. In *People v. Mormon* (1981), 97 Ill. App. 3d 556, 422 N.E.2d 1065, the court held that, for the purposes of section 115—5(c) of the Criminal Code that is in issue here, the record is what is stored in the computer and the information retrieved from the computer meets the requirements of the statute for admissibility. We hold that the Illinois Bell records also meet those requirements.

The next question involves the sufficiency of the foundation proof. An early case on the question of admissibility of electronic evidence is *People v. Wells* (1967), 80 Ill. App. 2d 187, 224 N.E.2d 288, which involved equipment used to trace telephone calls. The witness testified that he had worked on the equipment and that he went with the technician who checked through each stage of the tracing operation which checked back to the defendant's telephone. The witness verified the record showing the location of the number to which the· technician traced the call. He admitted that it was the technician who determined the number and that he took the technician's word that it was that particular number. The appellate court recognized that the witness' testimony technically was hearsay but that it was a type of hearsay that fell within one of the exceptions to the hearsay rule. The court made this observation (*People v. Wells*, 80 Ill. App. 2d at 194):

> "The basis for the admissibility of the records is that the *circumstantial probability of their trustworthiness* is a practical substitute for cross-examination of the individual making the entries." (Emphasis added.)

*People v. Wells* was cited in one of the first cases dealing with computer records, *People v. Gauer* (1972), 7 Ill. App. 3d 512, 288 N.E.2d 24, which also cited *King v. State ex rel. Murdock Acceptance Corp.* (Miss. 1969), 222 So. 2d 393. In *King* the supreme court of Mississippi set down the standards of admissibility of computer records: It must be shown that the electronic computing equipment is recognized as standard, that the entries are made in the ordinary course of business at or reasonably near the time of the happening of

the event recorded and the testimony satisfies the court that the sources of information, method and time of preparation were such as to indicate its trustworthiness and justify its admission. *King* and *Gauer*, in turn, were both cited with approval in *Department of Mental Health v. Beil* (1976), 44 Ill. App. 3d 402, 357 N.E.2d 875. The Illinois Supreme Court addressed the question in *Grand Liquor Co. v. Department of Revenue* (1977), 67 Ill. 2d 195, 367 N.E.2d 1238, and accepted the *King* standard.

A number of appellate courts have passed on the question since *Grand Liquor*, and, with one possible exception, have adhered to the requirements set out in *King*. That possible exception, *People v. Bovio* (1983), 118 Ill. App. 3d 836, 455 N.E.2d 829, cited by the defendant in the trial court and in this court, reversed a conviction, saying that the testimony failed to establish that the computer program was "standard, unmodified, and operated according to its instructions." (*People v. Bovio*, 118 Ill. App. 3d at 842.) We note that the court cited no precedential authority for its seeming expansion of the standards accepted by the supreme court in *Grand Liquor* and by all other Illinois appellate courts. The opinion does refer to North, *Computer Evidence in Illinois*, 71 Ill. B.J. 590, 593 (1983), in which the author used the phrase, "unmodified program operated according to its instructions" as part of what he described as the admissibility test in "computer/legal jargon."

The *Bovio* court also emphasized that a computer system which performs calculations, and which was involved there, must be scrutinized more closely than a system which retrieves information, which is involved here. Moreover, the *Bovio* opinion does not disclose what type of computer system was used. In this case, not only did the trial court have the testimony of Miller that the computer was "standard and reliable," but the judge correctly held that he could take judicial notice that IBM is a "standard, reliable computer." (*People v. Hendricks* (1986), 145 Ill. App. 3d 71, 495 N.E.2d 85.) (We note that the court in *People v. Hendricks* cited *Bovio* as authority for the rule of *Grand Liquor*.) We cannot be certain that the *Bovio* court meant to say that proof that the computer program was "unmodified and operated according to its instructions" was necessary in addition to proof that it was "standard." If it did, we respectfully disagree and, as we must, adhere to the admissibility test stated by the supreme court in *Grand Liquor*.

Since Miller also testified that the procedures followed were in the regular course of business, it is apparent that the first two tests imposed by *Grand Liquor* have been met. The next question is

whether the third has been, that is, was the trial court justified in concluding that the sources of information, method and time of preparation were such as to indicate the entries' trustworthiness? This test deals with the material that is put into the computer.

At the outset, we must express recognition that the proof of the information that went into the computer and the source of that information could have been better, but fairness requires recognition also that the defendant's objection was far from specific. Before Miller testified, the defendant's attorney made an oral motion *in limine* in which he said that the records were prepared in preparation for trial and that he did not think the State would be able to establish a proper foundation, citing *People v. Bovio*. The assistant State's Attorney said he would be able to lay a proper foundation. After colloquy between the State, defense and the judge, the judge said he would rely on the State's offer. The thrust of the defense argument on the question of foundation was that the State would not be able to establish that the information which went into the computer was put in contemporaneously "with the event." Miller's testimony that the entries were made contemporaneously with the event refuted that argument. The defendant's attorney did not ask her any questions. After she completed her testimony, the judge asked if there were any objections to any of the exhibits, which included all of the things recovered from the premises, pictures of the premises and the Illinois Bell records. The defendant's attorney said he objected only to the phone company records, without any further specification. The judge then expressed his reasons for upholding admissibility and invited any further comment from the defendant's attorney, who said, "Just note our objection for the record." We do not believe that the precise argument made in this court—that the trustworthiness of what was put into the computer was not established—was ever made to the trial judge. If the argument had been made, the State would have had an opportunity to correct any deficiency in the foundation proof. (See *People v. White* (1970), 131 Ill. App. 2d 652, 264 N.E.2d 228.) But since the State makes no issue of the specificity of the objection, neither will we.

 Our task, however, is not to determine whether the foundation could have been better; it is to determine whether the trial judge abused his discretion. We conclude that he did not. To begin, we refer back to the observation of *People v. Wells* that the "circumstantial probability" of the trustworthiness of the evidence is the basis of the record's admissibility. The judge could properly consider that the information retrieved from the computer was consistent

with the other "circumstances" disclosed by the evidence. (See *People v. Mormon*, 97 Ill. App. 3d at 566.) First, strong support for the reliability of the record lies in the fact that the very person named as the subscriber of the telephone was, in fact, at the listed premises when the police arrived. Second, the record showed the telephone number to be 421-1007, and a police officer testified that the defendant called that number after he was arrested. (The defendant later admitted that that was the number.) Third, the records establish that bills were sent to Jose Rivera at the rear building and that the bills were paid. Fourth, the records show that the phone had been disconnected, and the defendant testified that he had moved near the time of disconnection. Last, and most important, the judge knew that Illinois Bell, a large corporation, disinterested in the outcome of the case, relied on the records in the day-to-day operation of its business. Such reliance has been recognized as an important factor in determining the trustworthiness of such records. *People v. Mormon*, 97 Ill. App. 3d at 564-65; *United States v. Vela* (5th Cir. 1982), 673 F.2d 86.

If the defendant had any doubt of the authenticity or accuracy of the information he could have requested an examination of the "original reproduction," but he did not do so. (*People v. Mormon*, 97 Ill. App. 3d at 565.) His attorney asked no questions of the record keeper, nor did he ask the defendant any questions specifically addressed to the records. In closing argument, the defendant's attorney made no attempt to discredit the records. Instead, he made one remark which can only be construed to mean that he was conceding that the records were accurate, but he was suggesting that someone else used the defendant's name in establishing the service. (See *United States v. Vela* (5th Cir. 1982), 673 F.2d 86, 90.) We judge, therefore, that the trial judge did not abuse his discretion in admitting the records.

The defendant's last contention is that his sentence represents an abuse of discretion. At the time of sentencing the court said, "This is one of the largest amounts in this court that I have come across, over 500 grams of cocaine." The defendant argues that, because the amount of cocaine determines whether or not a crime will be classified as a Class X felony, thus allowing a mandatory jail sentence of 6 to 30 years, the court may not consider the amount of cocaine in sentencing. He cites *People v. Powell* (1987), 159 Ill. App. 3d 1005, 512 N.E.2d 1364, for the proposition that a material element of an offense cannot be relied upon as a factor in aggravation. In *Powell*, the defendant was convicted of attempted murder and sentenced to the maximum term of 30 years. In sentencing, the court relied in ag-

gravation primarily on the finding that the defendant intended to kill the people that he had shot. The appellate court did not reduce the sentence, but remanded for new sentencing, saying that since intent to kill was a material element of the offense, it might not be relied upon as a factor in aggravation. We do not believe that *People v. Powell* is in point.

■■ To follow the defendant's argument to its logical conclusion, two defendants, equal in all respects except that one sold 31 grams of cocaine and the other 1,000 grams, could not receive disparate sentences. Or if the same two defendants were convicted of theft of property valued in excess of $300, one who stole $1 million could not be punished more severely than one who stole $301. Such a conclusion is manifestly unacceptable. Moreover, the record shows that the amount of the cocaine was not the only factor in the judge's consideration. When he revoked the defendant's bond after the jury verdict, he noted that it was a "serious drug operation of some magnitude" which presented a danger to the community. At the sentencing hearing, after commenting on the amount of cocaine involved, the court also added that the evidence indicated "a rather major and organized drug-pedestrian-link operation." The evidence supports those observations of the judge. We find no abuse of discretion in the sentence.

■■ The State concedes that the sentence of seven years is improper, because possession with intent to deliver less than 30 grams of PCP is a Class 3 felony with a sentence range of two to five years. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(6).) Therefore, the defendant's sentence of seven years does not conform to the statute. We reduce the sentence under count II to a term of four years.

For these reasons we affirm the judgment of conviction on both counts and modify the sentence on count II.

Judgment affirmed and modified.

BILANDIC, P.J., and HARTMAN, J., concur.