2023 IL App (1st) 192519
Opinion filed January 30, 2023

First Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18 CR 12339 |
| VICTOR HUDSON, | ) ) | The Honorable Angela Munari Petrone, |
| Defendant-Appellant. | ) ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justice Pucinski concurred in the judgment and opinion.
Justice Coghlan dissented, with opinion.

**OPINION**

¶ 1    A team of officers executed a warrant at the home of several members of the Hudson family, including Victor Hudson. According to the search warrant, the officers were looking for Tommie Williams, who they suspected of manufacturing and distributing cannabis. The officers did not find Williams or cannabis; instead, they found Hudson and a gun. The State charged Hudson with armed habitual criminal, and a jury found him guilty. The trial court sentenced Hudson to nine years in prison.

¶ 2    Hudson challenges his conviction on three grounds: (i) the State failed to prove him guilty beyond a reasonable doubt, (ii) the trial court committed multiple errors when responding to questions from the jury, and (iii) the trial court erroneously barred testimony that (a) the officers' search warrant targeted someone other than Hudson and (b) the officers were not looking for a gun.

¶ 3    We agree with Hudson that the evidence against him is weak. To prove Hudson's guilt, aside from an unmemorialized confession, which Hudson denied making, the State relied on two utility bills and a bottle of pills found in the same bedroom as the gun. By contrast, Hudson presented three witnesses and documentary evidence showing that he lived in the basement, not in the bedroom where officers found the bottle and gun. At oral argument, the State conceded these accounts presented "conflicting evidence" that was not "completely overwhelmingly one-sided" and that required the jury "to make a credibility determination." The jury had the task of deciding between these narratives, and their decision to find Hudson guilty was not unreasonable.

¶ 4    The trial court also committed no error in responding to the jury's questions about the jury instructions. We do not assess whether the trial court could have answered the jury's questions better, only whether the court answered them adequately. The trial court did so.

¶ 5    We find error, however, in the trial court's decision to exclude the contents of the warrant. In the unique circumstances here, we conclude that the warrant's contents do not implicate the hearsay rule because its introduction would have been to provide a full explanation of the police conduct in executing the warrant. In a similar, though distinct vein, we also are persuaded by Hudson's analogy to the completeness doctrine in other contexts and find that, absent a chance to introduce evidence the warrant targeted a different person and other items, testimony about the

existence of the warrant here casted a cloud of predetermined guilt over the remainder of the trial evidence. Accordingly, we reverse and remand for a new trial.

¶ 6                                        Observation

¶ 7      Hudson's mother was in bed, and without warning, about a dozen armed police officers burst into her home. Several officers came to her bedroom, guns drawn, shouting profanities. Meanwhile, officers in the living room held her 17-year-old grandson to the ground with knees in his back. Hudson entered the living room, and an officer punched his face without warning. The officers mostly do not dispute applying force.

¶ 8      The dissent believes we have engaged in fact-finding to arrive at this narrative, but this testimony comes from the record. Dorothy Hudson testified that officers came into her room shouting, "everybody get the F up," and "had the light and gun in [her] face." She describes hearing a "boom, boom, boom," which she learned was police coming through the front door. We learn that when Hudson entered the living room, she told the officers, "that's my son," and "they said shut the F up; and they hit him."

¶ 9      Randy testified that he was sleeping and "hear[d] a big old boom" and saw what he estimated as "15, 17" officers with "a lot of guns." Randy adds, "the officer was yelling, like get the F down," and Hudson said, "please, get off my son *** and the officer hit him" with a "closed fist" on his nose. Hudson testified that he heard a "bamming" upstairs and went into the living room where he saw "Randy, and the police got their knee in his back." Hudson told the officers to "hold on" and asked, "what's happening." Then the officer "punched [him] in [his] nose."

¶ 10      The officers agreed that "12 to 15" officers entered the home. They testified that Randy raised his middle fingers and yelled at them and that Hudson ignored commands to stop walking

into the living room. Officer Tellez agreed that he "grabbed [Randy] by the wrists" and then "rolled to the ground and began wrestling" after Randy stiffened his arms. Thus, we reject the dissent's groundless assertion that we "cherry-pick[ed]" testimony. *Infra* ¶ 114. The officers did not dispute applying force.

¶ 11    In any event, we do not decide between the different narratives. Instead, justice demands we recognize this unseemly behavior, which exacerbates the climate of distrust toward both law enforcement and the criminal justice system that prevails among many black and brown residents. The law enforces a standard of behavior for the actors in our criminal legal system, including enforcement personnel, prosecutors, defense attorneys, correction and probation officers, and the courts. When those actors' behavior offends that standard and endangers members of the public, the judiciary must not remain silent, else our silence signifies indifference and, in a broader sense, approval. See *People v. Washington*, 2021 IL App (1st) 163024, ¶ 50 (Walker, J., dissenting) (remaining silent leads to wrongful convictions that "can devastate families, foreclose career opportunities, and undermine the integrity of our justice system").

¶ 12    Simply put, the behavior the Hudsons described is incompatible with the fair and equitable administration of justice. Illinois courts have historically commented on misbehavior not an issue in the case when the record divulges an abuse of office, mistreatment of another, or conduct otherwise inappropriate. See, *e.g.*, *People v. Lewis*, 75 Ill. App. 3d 259, 279-80 (1979) ("Although the actions of [the officers] in inflicting the injuries upon defendant were regrettable and although this court cannot excuse nor condone the excessive force used since it appears to have been unnecessary to effectuate the arrest, we conclude that *** the force used *** did not result in defendant giving a statement."); see also, *e.g.*, *People v. Potts*, 2021 IL App (1st) 161219, ¶ 165

(finding, "we would not condone *** conduct from the police" even where "we have no authority" to remedy it); *People v. Finklea*, 119 Ill. App. 3d 448, 454 (1983) (court "d[id] not mean to condone the police conduct in [the] case" even though conduct did not result in reversible error in defendant's interrogation). *Cf.*, *e.g.*, *People v. White*, 16 Ill. App. 3d 419, 428 (1973) (noting, "we do not condone the conduct of the prosecutor" where only issue was judge's consideration of improper sentencing factor); *People v. Foss*, 201 Ill. App. 3d 91, 94 (1990) ("we cannot condone the prosecutor's conduct" even though conduct did not amount to error). Consistent with this precedent, we must speak about what the Hudsons saw and heard.

¶ 13    To say nothing in the face of the treatment of the Hudsons would be incompatible with the judiciary's role as a fundamental protector of the citizen against arbitrary or unwarranted conduct by the State. We write in the hope that "[e]very community resident [can] live, work, and travel confident in an expectation that interactions with police officers will be fair, operate consistent with constitutional norms, and be guided by public safety free from bias or discrimination." U.S. Comm'n on Civil Rights, *Police Use of Force: An Examination of Modern Policing Practices* 137 (Nov. 2018) https://www.usccr.gov/files/pubs/2018/11-15-Police-Force.pdf [https://perma.cc/8CGR-AQQ9].

¶ 14    Our observation has no bearing on the guilt or innocence of Hudson or the issues before us. Nonetheless, the dissent confuses this observation, this *obiter dicta* (Latin for "said in passing"), with a "factual determination." *Infra* ¶ 113. It goes so far as to cite cases as if our observation were binding, including *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981), a case about officer safety, and *People v. Mandarino*, 2013 IL App (1st) 111772, where we affirmed the

conviction of a police officer for aggravated battery and official misconduct following a traffic stop.

¶ 15    In an accountable and fair criminal justice system, law enforcement officers treat everyone with whom they interact the same way they would want themselves and their family members treated under similar circumstances. See Dean A. Strang, *Bryan Stevenson Brings Light to Our Criminal Justice System's Darkest Corners*, The Progressive Magazine, Dec. 28, 2015, https://progressive.org/magazine/bryan-stevenson-brings-light-criminal-justice-system-s-darkest-corners/ [https://perma.cc/7645-5Z7T] ("We don't need police officers who see themselves as warriors. We need police officers who see themselves as guardians and parts of the community.").

¶ 16    Our observation speaks to this: In view of the testimony, is this the way the public should expect police to behave? To dismiss as business as usual the police officers' conduct would dishonor the good men and women of the Chicago Police Department who serve with dignity and sacrifice so much for the safety and well-being of their community.

¶ 17                                    Background

¶ 18    A team of 12 to 15 officers executed a search warrant for a Williams, not Hudson. And the officers were looking for cannabis and related paraphernalia, not a gun. The officers found neither Williams nor cannabis and related paraphernalia. Still, the police recovered a gun from a back bedroom and arrested Hudson.

¶ 19                            *The Officers' Perspective*

¶ 20    One of the officers assigned to execute the search warrant, Carlos Rojas, described the residence as a single-family home with one floor and an "unfinished basement." The staircase to the basement lies immediately to the left in the home's front vestibule. To the right, one enters a

combination living and dining room. Off of that, to the left is a bedroom (Bedroom 1); down a hallway, a bathroom is on the right; and a bedroom is on the left (Bedroom 2). The end of the hallway leads into the kitchen, with another bedroom off of it (Bedroom 3).

¶ 21    Rojas served as "entry officer," one of the first inside. When he climbed the front stairs, he saw the door "wide open" and entered. Three people sat on a pair of sofas in the living room. Five more people were in the house for a total of eight. Rojas identified one of them as Randy Hudson (Randy).

¶ 22    Rojas told Randy to raise his hands. As Randy complied, he extended his middle fingers and said, "f*** y'all; don't put your hands on me, or I'll f*** y'all up." At that moment, Rojas looked to his left toward the kitchen and saw Hudson walking toward him. Hudson ignored Rojas's commands to stop and reached out his hands "in a menacing manner." Another officer battered and detained Hudson.

¶ 23    As to Randy, Officer Guillermo Tellez grabbed his wrists and pulled him off the couch. Randy "stiffened his arms, clenched his fists, [and] continued yelling profanities." Tellez wrestled Randy to the ground and "administer[ed] some open [hand] strikes" and "knee strikes" to subdue and detain him.

¶ 24    Rojas searched several areas and found a gun "laying on top of a jacket *** in the closet of [Bedroom 3]." He saw the gun "immediately" when he looked down inside the closet. Rojas continued to search Bedroom 3. He found a pair of pants hanging on the knob of the door and a wallet. Rojas estimated that the jacket and the pants were adult-sized. He also saw more men's clothing in the closet and behind the door. Finally, Rojas found two-month-old pieces of mail on a dresser addressed to Hudson at the residence— a ComEd bill and a People's Gas bill. Officers

eventually took Hudson to the police station. Before leaving, Hudson had medicine with his name on it retrieved from the top of the dresser in Bedroom 3.

¶ 25    Officer Angel Collazo, who was present during the search, met Hudson at the police station and read him the *Miranda* warnings. See *Miranda v. Arizona*, 384 U.S. 436 (1966). After Hudson said he understood them, Collazo asked Hudson if he wanted to "share his side of the story as to what happened." According to Collazo, Hudson said:

> "I've lived right there on Karlov for two years with my mother, Dorothy Hudson.
>
> I've got six kids, ages 35 to 12. As you can see, that's my bedroom with my clothes,
>
> hat, and medication. I've had that gun for a long time. I forgot it was in my closet."

Though Collazo did not specify the rest of the statement, he testified that Hudson said the exact words, "I've had that gun for a long time." Tellez, also present, testified similarly.

¶ 26    Chicago police officer Robert Franks, an evidence technician, testified that he examined the firearm recovered from Bedroom 3 along with several live rounds and cartridge cases. After running five separate tests to recover fingerprints, he identified none on the gun, live rounds, or cartridge cases.

¶ 27                                    *Residents' Perspective*

¶ 28    Dorothy Hudson (Dorothy), Hudson's mother, testified that she lived at the house for 15 years and Hudson had resided there for most of that time. She explained that her daughter, who does not live in the home, sometimes stays in Bedroom 1, she sleeps in Bedroom 2, and Randy sleeps in Bedroom 3. Hudson did not occupy any first-floor bedrooms; he stayed in the basement. Dorothy could not remember how long Hudson had lived in the basement, other than "for a while." Because Dorothy had boarded up the inside access to the basement, the sole access was a set of stairs outside the back door.

¶ 29    On the day of Hudson's arrest, officers came into Dorothy's bedroom with a "light and gun in [her] face," shouting, "everybody get the F up." She went to the living room, where officers had Randy restrained. On her way to the living room, she saw Hudson coming from the back. She heard Hudson tell the officers, "that's my son," and the officers responded by hitting Hudson, saying, "shut the F up."

¶ 30    Randy testified that he lived and slept in Bedroom 3 with his younger brothers. His older brother, Victor, occasionally stayed in the room about three days a week. His father did not store belongings in Bedroom 3, including clothing and medicine. Randy never saw Hudson in Bedroom 3 the day the officers executed the warrant.

¶ 31    When the officers executed the warrant, Randy was asleep with his girlfriend on the living room couch. He heard a "big old boom" and saw several officers with guns. Officers "slammed" Randy's face into the floor. Randy said several officers had their knees on his back, but the trial court sustained the State's objection to that portion of his testimony. While on the ground, Randy saw Hudson running into the house, telling the officers to "please, let go of [his] son." Randy watched as the officers hit Hudson in the nose with a closed fist.

¶ 32    Hudson testified in his own defense. He lived in the basement for two years. Hudson's ID, voter registration, and application for food stamps indicated he lived in the basement. Hudson described the basement layout and explained that he entered and left the basement through the back door, to which he had keys.

¶ 33    On the morning the officers executed the warrant, Hudson "heard a bamming upstairs." He went out the back door and upstairs, through the kitchen, and into the front living room. Hudson saw the police had their knees on Randy's back, and Hudson asked them what was going on. An officer then punched Hudson in the nose, sat him down, and handcuffed him. Hudson denied telling

the officers that he forgot he had a gun in the closet, denied putting items in closets on the main floor, and denied telling the officers he needed medicine before leaving the house.

¶ 34                                *Jury Instructions, Deliberation, and Verdict*

¶ 35     The State charged Hudson with the offense of armed habitual criminal and, in the charging instrument, included two possible mental states: "knowingly or intentionally" possessing the gun. During the jury instruction conference, Hudson's counsel requested the trial judge give Illinois Pattern Jury Instructions defining intent and knowledge. See Illinois Pattern Jury Instructions, Criminal, No. 5.01A (approved Oct. 28, 2016) (defining "Intent") (hereinafter IPI Criminal No. 5.01A); Illinois Pattern Jury Instructions, Criminal, No. 5.01B (approved Oct. 28, 2016) (defining "Knowledge—Willfulness") (hereinafter IPI Criminal No. 5.01B). The trial court denied Hudson's request, finding the instructions confusing "legal-ese." The court explained, however, that it would give the relevant instructions if the jury asked for them.

¶ 36     During deliberations, the jury sent out a note with four questions on it:

"1. Why were police there? What was the warrant for?

2. Was the gun registered to anyone?

3. If Victor was living or sleeping in bedroom #3 but was unaware of the gun being in the closet, is he guilty?

4. What does 'power and intention' mean in regards to the gun being the bedroom? Does he have to have knowledge of the gun in order to have intention?"

Before agreeing to an answer on the first question, Hudson's counsel renewed her argument that the jury should have been told the target and contents of the warrant. The trial court again rejected the argument finding the record on that point "very clear." For the first question, the trial court

answered: "Police were there with a lawful warrant. What the warrant was for is not in evidence and should not be considered by you."

¶ 37    The parties agreed to the court's answer to the jury's second question: "Whether the gun was registered to anyone is not in evidence and should not be considered by you." The parties also agreed to the court's answer to the third question: "The answer to #3 is contained in the instructions you have received."

¶ 38    The parties initially agreed to tell the jury that their instructions answered the fourth question. After further discussion, Hudson's counsel asked that the definitions of intent and knowledge be sent to the jury. The court wrote to the jury: "The answer to #4 is contained in the instructions you have received." The court also sent additional instructions on intent and knowledge. Though not entirely clear from the discussion on the record, the instructions in the common law record suggest the court sent back IPI Criminal No. 5.01A (Intent) and Illinois Pattern Jury Instructions, Criminal, No. 5.01C (approved Dec. 8, 2011) ("Actual Knowledge") (hereinafter IPI Criminal No. 5.01C). Hudson's counsel had previously requested IPI Criminal No. 5.01B as the instruction defining knowledge.

¶ 39    After further deliberation, the jury found Hudson guilty of armed habitual criminal. After the jury poll, the court read a note from the jury: "Although the law is clear, the evidence is sufficient, the circumstances for Victor are unfair. We would like you to consider this as you pronounce sentence. Sincerely, the Jurors."

¶ 40    Hudson filed a motion for a new trial and alleged, among other issues, that the trial court erred when it denied his motion *in limine* to allow testimony about the target of the search warrant and the items to be seized. The trial court denied the motion. After a hearing, the trial court sentenced Hudson to nine years in prison.

¶ 41                                    Analysis

¶ 42     Hudson raises four arguments: (i) the evidence was insufficient to find him guilty of armed

habitual criminal, (ii) the trial court erred in denying his motion *in limine* to introduce testimony

about the target of the search warrant and the items intended for seizure, (iii) the trial court erred

in two of its answers to the jury's questions, and (iv) alternatively, trial counsel was ineffective for

failing to object to the erroneous answers or to offer the correct responses. We agree with Hudson's

second argument and reverse and remand for a new trial.

¶ 43                            *Sufficiency of the Evidence*

¶ 44     Hudson first attacks the sufficiency of the evidence on several grounds that all boil down

to one essential point: Hudson did not live in or have control over Bedroom 3. He says we should

ignore his statement to police as it is not memorialized and, therefore, "too thin a basis upon which

to sustain [his] conviction." On the other hand, the State emphasizes the statement Hudson gave

police, along with the mail and medicine found in Bedroom 3. As for the evidence Hudson lived

in the basement, the State says we should disregard it since the jury heard and had the opportunity

to weigh that evidence. We agree with the State. Though modest, the evidence suffices to prove

Hudson guilty beyond a reasonable doubt when viewed in a light most favorable to the State.

¶ 45     To prove Hudson guilty of armed habitual criminal, the State had to show two elements:

(i) Hudson possessed a firearm and (ii) possession was after having been convicted of two

qualifying offenses. See 720 ILCS 5/24-1.7(a) (West 2018). The parties do not dispute Hudson's

qualifying criminal history. Rather, they focus on whether the State adequately proved possession.

The State does not argue—nor could it—that Hudson had actual possession of the gun when the

officers executed the search warrant. In its place, the State sought to prove constructive

possession—that Hudson had knowledge of the gun's presence and "immediate and exclusive"

control over the area where officers found it (Bedroom 3). *E.g.*, *People v. Fernandez*, 2016 IL App (1st) 141667, ¶ 18. We have recognized that constructive possession often involves "entirely circumstantial" evidence (*id.*), and when reviewing its sufficiency, we ask whether, after making all reasonable inferences in the State's favor, a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt (*id.* ¶ 17).

¶ 46    We start with the State's circumstantial evidence that Hudson lived on the first floor and slept in Bedroom 3. Officers found ComEd and People's Gas bills addressed to a "Victor Hudson" on a dresser in Bedroom 3. The officers also testified that they retrieved medicine from the dresser in Bedroom 3—at Hudson's request—before taking him to the police station. We usually will not uphold a conviction based on constructive possession where the defendant merely has access to the area containing contraband. *Id.* ¶ 21 (citing *People v. Sams*, 2013 IL App (1st) 121431, ¶ 13). Even personal effects and mail do not necessarily show control absent additional circumstantial evidence. For example, in *Fernandez*, we held the evidence of constructive possession insufficient even though officers located the defendant's passport and insurance card in the room where they spotted a gun. *Id.* ¶ 20-22. Nonetheless, we would be inclined to reverse if the State's only evidence was the mail and medication.

¶ 47    But the State's conviction in *Fernandez* fell apart on more than the scant documentary evidence. The trial evidence showed that the defendant received mail at a different address, and the State offered no affirmative evidence the defendant had been in the house where police discovered contraband hidden under a mattress. *Id.* ¶ 22 (discussing *People v. Maldonado*, 2015 IL App (1st) 131874). While some of Hudson's documentary evidence specified he lived in the basement, all the mail and documentary evidence linked Hudson to the address. Moreover, Hudson was present when officers executed the search warrant, and though witnesses differed on where

Hudson was coming from, they all testified he came into the living room from the back of the house. Finally, the police saw the gun in plain view.

¶ 48    Even if, for the sake of argument, we assume this evidence lacking, Hudson cites no authority to permit disregard of his statement or that the jury should have disregarded it. Instead, he focuses on the circumstances in which he made the statement. He argues that the officers' aggressive entry into the home, the "beating and manhandling of his teenage child," and the officers punching him in the face render his statement "not trustworthy at all." Yet, independent of the officers' conduct, Hudson does not draw a connection between their behavior and his statement hours later at the police station. Indeed, he does not claim that the conditions at the station were coercive or threatening.

¶ 49    Most of Hudson's other arguments would require drawing inferences in his favor or reweighing the evidence. For example, the circumstances under which a defendant confesses generally go to the confession's weight. *People v. Hood*, 244 Ill. App. 3d 728, 736 (1993). Here, we know from the jury's second note that the jury perceived "unfair[ness]" in how the police treated Hudson. Even accounting for that unfairness, the jury found the evidence satisfied the elements of the offense. Similarly, Hudson emphasizes the evidence he provided, including voter registration and ID showing his address as the basement. The jury heard that evidence and could reject it.

¶ 50    We have no basis on which to second guess Hudson's confession and, taken together with the State's other circumstantial evidence, it minimally suffices to sustain his conviction. Hudson's path to reversal requires drawing inferences in his favor, discounting evidence the jury properly considered, or elevating his evidence over the State's evidence. None of these tasks are proper. See *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004) (reversal on sufficiency grounds

appropriate only where record "compels the conclusion that no reasonable person could accept it beyond a reasonable doubt").

¶ 51                    *Jury Questions and Ineffective Assistance of Counsel*

¶ 52     Hudson next challenges two of the trial court's responses to questions from the jury. First, he argues the trial court diminished the State's burden of proof by instructing the jury it "should not *** consider[ ]" the lack of evidence of gun registration. Second, Hudson argues the trial court gave the incorrect pattern jury instruction on the mental state of knowledge. Recognizing he forfeited these claims, he asks for review under the plain error doctrine or, alternatively, claims of ineffective assistance of counsel.

¶ 53     The State responds that both answers the trial court gave "were responsive to the jury's questions, correct on the law, and well within the trial court's sound discretion."

¶ 54     Despite excusing Hudson's forfeiture since the evidence is closely balanced, we still find the trial court committed no error**.** As a result, counsel was not ineffective.

¶ 55     We start with forfeiture because it applies to both jury question claims. Generally, to preserve a claim for review, a party must object when the alleged error occurs and include that error in a post-trial motion. *People v. Mitchell*, 2018 IL App (1st) 153355, ¶ 39. Hudson's counsel offered no objection to the trial court's answer about gun registration. And, though she preserved her general objection to the motion *in limine*, denying initial instructions about mental states, she ultimately acquiesced in the trial court's final answer to the jury.

¶ 56     We can review forfeited errors in jury instruction under the plain error doctrine where clear or obvious error occurs in a closely balanced case or where the error itself is so severe as to affect the fairness of the defendant's trial. *Id.* ¶ 40.

¶ 57 Ordinarily, the first step in a plain error analysis involves determining whether an error occurred. *Id.* Our supreme court has reminded us that plain error is a forfeiture doctrine and considering first whether the evidence is closely balanced avoids commenting on the merits of a forfeited claim. *People v. White*, 2011 IL 109689, ¶¶ 134, 144. Such an approach seems doubly appropriate here: Hudson raised a side-along claim of ineffective assistance of counsel. Thus, our analysis under the closely balanced prong of plain error is functionally identical to the prejudice prong of ineffective assistance claims. *Id.* ¶ 133 (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). In short, to excuse Hudson's forfeiture and proceed to the merits (determine whether the trial court erred or counsel provided deficient performance), we initially must resolve whether the trial evidence was closely balanced. *Id.* We conclude it was.

¶ 58 The State's brief argues the trial evidence was "quite overwhelming" in favor of guilt, focusing on Hudson's confession to two witnesses, the direction from which Hudson entered the living room, and the various personal effects acquired in Bedroom 3. The State dismisses Hudson's evidence, without much discussion, as "comparatively weak." The State forgets that our analysis "does not involve the sufficiency of close evidence but rather the closeness of sufficient evidence." *People v. Sebby*, 2017 IL 119445, ¶ 60. At oral argument, the State made repeated concessions about the closeness of the evidence, including describing it as a "credibility determination" for the jury. As we have said, the State's version of events was sufficient for the jury to reject Hudson's version. But that does not mean Hudson's version was "fanciful," uncorroborated, or inherently incredible. See *id.* ¶ 61.

¶ 59 Two witnesses and documentary evidence (Hudson's ID and voter registration) corroborated Hudson's claim he lived in the basement. The State's witnesses corroborated Hudson's and Randy's versions of the officers' entry and treatment of the occupants. But the

officers preferred circumspection in their description of restraining Randy and Hudson. Nothing in Randy's testimony about sharing a bedroom with younger siblings is rebutted by extrinsic evidence or inherently incredible. As we have already discussed, the documentary evidence linking Hudson to Bedroom 3 was a thin reed on which to rest the State's case. True, two officers testified Hudson made a statement, but Hudson denied making it, and because the officers did not record the interaction, nothing confirms either account. This was a classic credibility contest (see *id.* ¶ 63), and though the jury permissibly resolved that contest in the State's favor, still it was weak. Because the evidence was closely balanced, we excuse Hudson's forfeiture and turn to the merits.

¶ 60 The trial court has a duty to answer jury questions requesting clarification on points of law. *People v. Millsap*, 189 Ill. 2d 155, 160-61 (2000). At the same time, the trial court has discretion to decline to answer the jury's question in some circumstances (*id.*), any answer it gives should be specific and accurate. *People v. Childs*, 159 Ill. 2d 217, 228-29 (1994). We review *de novo* the legal accuracy of the trial court's answers to juror questions. *E.g.*, *People v. Jaimes*, 2019 IL App (1st) 142736, ¶ 45.

¶ 61 We begin with the trial court's answer to the jury's question about the gun's registration. The jury asked: "Was the gun registered to anyone?" The trial court answered: "Whether the gun was registered to anyone is not in evidence and should not be considered by you." Hudson does not contest, nor could he, the accuracy of the first part of the trial court's answer— there was no evidence of gun registration. Instead, he argues the last clause, instructing the jury not to consider the lack of registration evidence, improperly shifted the burden of proof away from the State. The State responds that the court's answer, in context of the juror's other instructions on the burden of proof, could not reasonably be misconstrued in the way Hudson claims. We agree with the State.

¶ 62    The State bears the burden of proof in a criminal prosecution, and "it similarly bears the consequences of any omission of proof." *People v. Murray*, 2019 IL 123289, ¶ 30. We do not believe the trial court's answer alleviated that burden. The missing registration evidence is essentially a red herring. Assuming, for the sake of argument, the gun was registered to someone else, the State still could have sustained its burden of proving Hudson unlawfully possessed it. Hudson argues that the jurors may have taken the trial court's answer about gun registration and applied it as more relevant evidence of guilt. That argument is speculative, mainly because the jury received the correct instruction about the burden of proof.

¶ 63    As the question of registration involves an issue collateral to Hudson's guilt or innocence, we find *People v. Sanders*, 129 Ill. App. 3d 552 (1984), on which Hudson relies, is distinguishable. There, the trial court misstated the issues instruction for attempted first degree murder, leaving the jury with the implication that the State did not have to prove the defendant intended to commit murder when he took a substantial step toward that goal. *Id.* at 564. Critically, the court in *Sanders* distinguished between errors in "mandatory instruction[s]" and errors in "nonmandatory instruction[s]," the latter of which can be cured by the totality of the other instructions. *Id.* at 563. Here, the trial court properly instructed the jury on the burden of proof before deliberations began. And unlike *Sanders*, even if the court's answer to the gun registration question produced error, the error was collateral to the main issues and the totality of the other instructions cured any error.

¶ 64    Hudson's second argument proves more difficult because it involves issues central to guilt or innocence. The jury asked: "What does 'power and intention' mean in regards to the gun being the bedroom? Does he have to have knowledge of the gun in order to have intention?" In response, the trial court did two things: (i) wrote to the jury, "the answer to #4 is contained in the instructions you have received," and (ii) sent back additional instructions defining intent (IPI Criminal No.

5.01A) and actual knowledge (IPI Criminal No. 5.01C). Hudson argues the trial court should have sent back IPI Criminal No. 5.01B instead of IPI Criminal No. 5.01C. The State responds that IPI Criminal No. 5.01C was the correct instruction under its theory of the case; therefore, the trial court committed no error. We conclude that giving IPI Criminal No. 5.01C did not reduce the State's ultimate burden of proof and, thus, does not support grounds on which to grant a new trial.

¶ 65    We start by comparing the relevant text of the two instructions. The trial court gave the following instruction on Actual Knowledge: "Actual knowledge is direct and clear knowledge, that is, knowledge of such information as would lead a reasonable person to inquire further." IPI Criminal No. 5.01C. Hudson would have preferred the "Knowledge—Willfulness" instruction, which we quote: "A person knows the nature or attendant circumstances of his conduct when he is consciously aware that his conduct is of that nature or that those circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that the fact exists." IPI Criminal No. 5.01B(1). Hudson's preferred instruction, IPI Criminal No. 5.01B, is the statutory default definition of knowledge. 720 ILCS 5/4-5(a) (West 2018).

¶ 66    The State resists IPI Criminal No. 5.01B on two grounds: (i) the trial evidence better aligns with proof of actual knowledge and (ii) the definition of actual knowledge "would be simpler and more straightforward." Either argument does not convince us.

¶ 67    The State's focus on the trial evidence misses the mark. First, though the instructions must be generally relevant to the parties' theories and the facts supporting those theories, the primary goal of jury instructions is to help jurors properly apply the law. See *People v. Hudson*, 222 Ill. 2d 392, 399 (2006). For the offense of armed habitual criminal—a possessory offense—IPI Criminal No. 5.01B more accurately states the law. The armed habitual criminal statute does not include an express mental state. 720 ILCS 5/24-1.7 (West 2018). But the Criminal Code of 2012 (Criminal

Code) requires knowledge for possession to amount to a voluntary act (*id.* § 4-2), and we have repeatedly held knowledge to be an element of constructive possession. *E.g.*, *Fernandez*, 2016 IL App (1st) 141667, ¶ 18. We also have described the element of knowledge consistently with the Criminal Code's definition of knowledge which is, in turn, consistent with IPI Criminal No. 5.01B. See *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 27 (knowledge proven by facts "which indicate that the defendant knew the contraband existed in the place where it was found"); 720 ILCS 5/4-5 (West 2018) (knowledge defined as "conscious[ ] aware[ness] *** that [relevant] circumstances exist"); IPI Criminal No. 5.01B (knowledge defined as "conscious[ ] aware[ness] that *** circumstances exist" or "substantial probability that the fact exists"). In sum, IPI Criminal No. 5.01B generally will be a more accurate statement of the law in a constructive possession case.

¶ 68    We also disagree with the State that the facts adduced at trial lend themselves to an actual knowledge instruction. True, Hudson admitted the gun was his, but in the same admission, he told officers he forgot the gun was in the closet. Hudson's forgetfulness is inconsistent with the actual knowledge instruction, which requires "direct and clear knowledge." See IPI Criminal No. 5.01C. So, as a legal and evidentiary matter, IPI Criminal No. 5.01B would have been the superior instruction to provide the jury in response to its question.

¶ 69    We also disagree with the State that IPI Criminal No. 5.01C is "simpler" or "more straightforward." The State's argument seems to be that the multiple bracketed paragraphs in IPI Criminal No. 5.01B would "offer definitions and theories of knowledge entirely inapplicable to the facts at trial." We suppose that would be true if the trial court recited each paragraph. But the committee note to the instructions expressly admonishes against giving the definition in each bracketed paragraph and offers the trial courtroom to choose the bracketed material best suited to the facts. See IPI Criminal No. 5.01B, Committee Note. For this case, the trial court would have

given the jury the instruction in only the first bracketed paragraph, which, as we have explained, aligns with both the statutory definition of knowledge and the definition of knowledge we have used in constructive possession cases. When properly limited to the applicable bracketed material, we think there is no material difference in the ease of understanding between IPI Criminal No. 5.01B and IPI Criminal No. 5.01C, and IPI Criminal No. 5.01B is the more legally correct instruction here.

¶ 70    We disagree with Hudson, however, that we should grant him a new trial on this basis. On the face of the instructions, IPI Criminal No. 5.01C puts a more significant burden on the State than IPI Criminal No. 5.01B. Had we any doubt about our plain reading of the dueling instructions, *People v. Hinton*, 402 Ill. App. 3d 181 (2010), dispels them. Moreover, though it addressed a different substantive issue, the court confirmed that proof of constructive knowledge (see IPI Criminal No. 5.01B) fails to carry the State's burden when actual knowledge is required (see IPI Criminal No. 5.01C). *Hinton*, 402 Ill. App. 3d at 184-85.

¶ 71    We are not persuaded otherwise by Hudson's reliance on *People v. Brouder*, 168 Ill. App. 3d 938 (1988), and *People v. Falls*, 387 Ill. App. 3d 533 (2008). In *Brouder*, the trial court gave the jury no instruction defining "knowledge" after it had expressly requested guidance. *Brouder*, 168 Ill. App. 3d 947. The same is true in *Falls*. *Falls*, 387 Ill. App. 3d at 538 ("trial court refused to resolve [the jury's] confusion, instead referring them to the instruction it had given"). Here the trial court answered the jury's legal question and, as we discussed, in a manner that did not reduce the State's ultimate burden of proof.

¶ 72    The trial court's answer about the gun's registration did not improperly diminish the State's burden of proof, and its answer defining knowledge with the "Actual Knowledge" instruction may have placed a greater burden on the State than was required. Moreover, because the trial court's

rulings were not reversible error, trial counsel cannot have been ineffective for failing to preserve Hudson's objections for appeal.

¶ 73                              *Completeness of the Search Warrant*

¶ 74    Finally, Hudson argues the trial court erred by limiting the evidence the jury heard relating to the search warrant. He does not dispute that the trial court properly allowed the State to introduce evidence that the warrant existed. On the contrary, he argues the State opened the door for him to introduce evidence that he was not the target of the warrant and the officers were looking for drugs, not a gun. Hudson argues he "needed this evidence" to avoid leading the jury to infer that "officers were targeting Hudson for possessing the weapon they found." As it did in the trial court, the State responds that any evidence beyond the warrant's existence would have been inadmissible hearsay. Considering that the parties dispute centers on the trial court's application of the law to the facts, we review the court's evidentiary ruling for an abuse of discretion. See *People v. Risper*, 2015 IL App (1st) 130993, ¶¶ 32-33 (discussing circumstances when appropriate to apply *de novo* review to evidentiary rulings). Because the trial court misapplied well-settled rules of evidence law, the court abused its discretion. *People v. Williams*, 188 Ill. 2d 365, 369 (1999) ("Where a trial court's exercise of discretion has been frustrated by an erroneous rule of law, appellate review is required to permit the exercise of discretion consistent with the law.").

¶ 75    Hudson first argues the warrant's contents are not hearsay because they are no more than a continued explanation of the officers' course of investigation. We agree.

¶ 76    Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *E.g.*, *People v. Edgecombe*, 317 Ill. App. 3d 615, 627 (2000). We have allowed officers to testify to detailed conversations they had out of court if their testimony is offered only to explain "the

circumstances of an investigation" and "to detail the steps leading up to a defendant's arrest and indictment." *People v. McNeal*, 160 Ill. App. 3d 796, 800-801 (1987). And we have distinguished between the existence of a search warrant and its contents. *People v. Rivera*, 182 Ill. App. 3d 33, 38 (1989). But, above all, identifying course-of-investigation evidence must never take the place of a principled analysis of the specific facts before us. *People v. Warlick*, 302 Ill. App. 3d 595, 598-600 (1998).

¶ 77    While conducting that analysis here, we are mindful that *Rivera* leads us to the heart of the course-of-investigation testimony—preventing the jury from drawing improper inferences. *Rivera*, 182 Ill. App. 3d at 38 (approving trial judge's goal of "prevent[ing] the inference that the tactical team acted in *** [an] illegal fashion").

¶ 78    Testimony about the course-of-investigation serves a nonhearsay purpose because it helps the jury understand why the police acted the way they did. *People v. Jones*, 153 Ill. 2d 155, 161 (1992). This means it prevents the jury from assuming the police acted arbitrarily or, as *Rivera* put it, in an "illegal fashion." See *Rivera*, 182 Ill. App. 3d at 38. We allow course-of-investigation testimony, then, to prevent jurors from filling testimonial gaps with improper inferences about police conduct. We see no reason, and the dissent has offered none, the police should be mandated as the exclusive benefactors of *Rivera*'s laudable goal. Fact, not speculation, should underlie juror inference. Thus, we see no basis for the dissent's assertion that applying *Rivera* to the unique facts here somehow expands this well-settled principle of evidence law (*infra* ¶ 93).

¶ 79    The dissent demotes *Rivera*'s rationale to a comment by the trial judge. The desire to prevent the inference that police acted in an "illegal fashion" may have originated with the trial judge, but we adopted that reasoning in finding an essential purpose of the course-of-investigation testimony was to prevent speculation by the jury for an improper purpose. And so, the dissent

cannot be correct that "no Illinois court" has permitted the course-of-investigation testimony to eliminate improper inferences. *Rivera* did. Here, as in *Rivera*, the warrant's contents had a relevant, nonhearsay purpose that supported admission. *Rivera*, 182 Ill. App. 3d at 38-39 (affirming trial court's decision to permit testimony that warrant authorized search of specific address and "the defendant's person"). We do no more than evenhandedly apply *Rivera*'s reasoning about the nature of hearsay to the unique circumstances here.

¶ 80    Doing so harmonizes with our longstanding practices. *E.g.*, *People v. Hunley*, 313 Ill. App. 3d 16, 35 (2000) (identifying "two-step analysis" trial courts should undertake when asked to admit course-of-investigation evidence that would otherwise be hearsay). A trial judge should first determine whether the out-of-court statement, offered for some purpose other than its truth, has relevance to an issue. *Id.* (discussing *Warlick*, 302 Ill. App. 3d at 599). If relevant, the trial judge should then weigh the relevance of the statement against the risk of unfair prejudice and possible misuse by the jury. *Id.* (same); see generally Ill. R. Evid. 403 (eff. Jan. 1, 2011) ("Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time"). We rest our analysis of *Rivera* on *Hunley* and *Warlick*. Because the dissent misreads *Hunley* and *Warlick* as requiring the exclusion of the course-of-investigation testimony on relevance grounds (*infra* ¶ 109), we put little stock in its assertion that we departed from "well-established law" (*infra* ¶ 106). Course-of-investigation testimony is relevant to facts of consequence because it explains why the police acted in the way they did. *Hunley*, 313 Ill. App. 3d at 35; *People v. Simms*, 143 Ill. 2d 154, 174 (1991) (finding testimony about out-of-court statement admissible as course-of-investigation testimony because testimony explained to jury why police continued to question defendant). Given the well-established relevance of this type of evidence, our analysis proceeds to *Hunley*'s second step, a balancing test.

¶ 81    Here, the disparity between the suspected offense reported in the search warrant and the offense for which Hudson was ultimately tried favors admitting the warrant's contents when balanced against the risk the jury used the warrant's existence to make an improper inference. Because the contents of the warrant mention neither Hudson nor a gun, it would be easy to disaggregate from the jury's consideration of Hudson's guilt for the charged offense. Simply put, there was no risk the warrant's contents, offered for a purpose other than its truth, would have been used for anything other than the limited purpose Hudson proposed: explaining the course of the officers' investigation. And, by offering the jury a complete picture of the officer's investigation, the testimony would have rebutted the baseless, thus improper, inference that the officers had been investigating Hudson. *People v. Thigpen*, 306 Ill. App. 3d 29, 40 (1999) (recognizing course-of-investigation testimony may need additional context to rebut inferences not based on facts).

¶ 82    Furthermore, we have record evidence—in the form of the jury's question—that *not* admitting the warrant's contents led to unnecessary confusion and focus on the warrant. A brief explanation of the warrant's target and evidence to be seized would have diffused a harmful distraction without damaging the State's case.

¶ 83    Because we have affirmative evidence from the jury that they were concerned about the substance of the warrant, we find hollow the dissent's concern that the warrant's contents were irrelevant. See *infra* ¶ 109. When evidence that would otherwise be hearsay is admitted to provide further context for police investigation, this concern becomes the opposite of that expressed by the dissent. Generally, we admit evidence of police investigative procedures only when it does *not* "directly impact[ ] the very essence of the dispute." *People v. Jura*, 352 Ill. App. 3d 1080, 1088 (2004); see also *Hunley*, 313 Ill. App. at 34-35 (approving officer testimony explaining investigatory procedures where otherwise hearsay testimony "did not reference the crimes

charged" and "did not go to 'the very essence of the dispute' "). Here, the evidence Hudson sought to admit did not refer to the crime charged and did not go to "the very essence" of the parties' dispute: whether Hudson had constructively possessed a gun.

¶ 84    As the dissent acknowledges, course-of-investigation testimony comes in when " 'necessary and important' " to the jury's understanding. *Infra* ¶ 96 (quoting *Simms*, 143 Ill. 2d at 174, citing *People v. Hayes*, 139 Ill. 2d 89, 130 (1990), and citing *People v. Johnson*, 116 Ill. 2d 13, 24 (1987)). This case presents that rare case meeting the "necessary and important" threshold. As we explained, the jury was thinking about the nature of the warrant. Ordinarily, we worry that out-of-court statements *admitted* for a nonhearsay purpose will confuse or distract the jury. See *Hunley*, 313 Ill. App. 3d at 35. From the jury's question, we know that *excluding* the evidence Hudson wanted to admit for a nonhearsay purpose led to the jury's distraction or confusion. The dissent does not explain, and we fail to see, how the jury could have misused the information that officers went to the home for an unrelated investigation. Indeed, although the dissent describes the warrant's contents as " 'hearsay,' " (*infra* ¶ 104 n.2), it fails to identify the "matter asserted" that Hudson ostensibly offered for its truth. See Ill. R. Evid. 801(c) (eff. Jan. 1, 2011). All the same, the warrant's contents did not bear on "the very essence of the dispute," and admitting its contents would have focused the jurors on the evidence of Hudson's guilt or innocence.

¶ 85    The dissent responds that we cannot read into the jury's question substantive consideration of the warrant's contents during their deliberations. *Infra* ¶¶ 104-05; see *People v. Downs*, 2015 IL 117934, ¶ 27 ("where a jury question is at issue *** courts should avoid attempting to divine anything about the jury's deliberative processes from that question"). Accepting that proposition, we do not need to speculate about *what* the jury thought of the warrant; we need only know that they *were* thinking about it—a fact apparent from the jury's questions ("1. Why were police there?

What was the warrant for?"). Those questions require no interpretation of the jury's deliberative process. All the same, if, as the dissent believes, the warrant's contents were irrelevant to the dispute, the jury would have no reason to care about the warrant *at all* (whatever they thought about it). Allowing Hudson to introduce testimony about the warrant's contents (the target and items to be seized) would have foreclosed the jury's self-described need to understand the warrant—a need likely exacerbated by the trial court instructing the jury the warrant was "lawful."

¶ 86 We reject as hyperbole the State's concern that our holding renders it "impossible to introduce evidence that a search warrant had been obtained at all." Our holding would not affect cases where the warrant targets the defendant. See *People v. Janis*, 240 Ill. App. 3d 805, 811-812 (1992). Similarly, our holding would not affect cases where defense counsel candidly admits that they seek to admit the contents of the warrant to disprove an element the State had to prove. See, *e.g.*, *People v. Nash*, 2017 IL App (1st) 143762-U, ¶ 41 (counsel argued contents warrant admissible to prove that person, other than defendant, possessed drugs found on premises). We cite *Nash*, not as precedent (see Ill. S. Ct. R. 23(e) (eff. Apr. 1, 2018)), but as an example of a category of cases already responsive to the dissent's purported concern that counsel might mislead the jury with this evidence. *Infra* ¶ 104 n.2. Additionally, our holding would not affect cases where evidence discovered due to a search warrant constitutes a small part of the evidence against a defendant. (For all these reasons, too, the dissent misplaces its reliance on cases like *People v. Virgin*, 302 Ill. App. 3d 438 (1998).)

¶ 87 We acknowledge that the abuse of discretion standard is among "the most deferential standard[s] of review in the law." *People v. Jacobs*, 2016 IL App (1st) 133881, ¶ 77. Still, this standard requires us to determine " 'the legal adequacy of [the] way the trial court reached its result.' " *Paul v. Gerald Adelman & Associates, Ltd.*, 223 Ill. 2d 85, 99 (2006) (quoting *People v.*

*Ortega*, 209 Ill. 2d 354, 360 (2004)). It is not "a rubber stamp." *Jacobs*, 2016 IL App (1st) 133881, ¶ 77. The "trial court must exercise its discretion within the bounds of the law." *Williams*, 188 Ill. 2d at 369. Here, the trial court's decision to exclude course-of-investigation testimony as "hearsay" was legal error (*Simms*, 143 Ill. 2d at 174) for the reasons we explained. Thus, we do not " 'substitute' " our judgment on this issue for that of the trial court, as the dissent insists. *Infra* ¶ 110 (quoting *People v. Illgen*, 145 Ill. 2d 353, 371 (1991)). Nor do we merely disagree with how the trial court exercised its discretion. *Infra* ¶ 110. Rather, we reverse the ruling because it violated the rules of evidence. *E.g.*, *People v. Prather*, 2012 IL App (2d) 111104, ¶ 30.

¶ 88    Moreover, the record contains evidence of potential undue prejudice from excluding evidence completing the warrant's contents. See *North Spaulding Condominium Ass'n v. Cavanaugh*, 2017 IL App (1st) 160870, ¶ 46 ("If a trial court's decision rests on an error of law, then it is clear that an abuse of discretion has occurred, as it is always an abuse of discretion to base a decision on an incorrect view of the law."). While the circumstances of this case are unique, not so the legal principles. Hence, its impact will be limited. Again, we reject the dissent's assertion that our analysis departs from "well-established law." See *infra* ¶ 106. We took the facts and the law as the parties presented them. Perhaps the dissent's objection is not that we departed from well-established law, but that well-established law had an unexpected application. If so, we caution that "invocation of phrases such as 'investigative steps' or 'police procedure' or 'course of the investigation' should not *** substitute for principled analysis." *Warlick*, 302 Ill. App. 3d at 599. Under these facts and longstanding law, the trial court should have granted Hudson's motion *in limine*.

¶ 89 The State argues that excluding the warrant's contents constitutes harmless error. Evidentiary errors are harmless where no reasonable probability exists that the jury would have acquitted absent the error. *In re E.H.*, 224 Ill. 2d 172, 181 (2006). Put another way, harmlessness depends on whether the remaining evidence "overwhelmingly supports [a] defendant's guilt." *People v. Reid*, 179 Ill. 2d 297, 314 (1997). We already have found the evidence closely balanced and definitionally not overwhelming. The State also conceded as much at oral argument. Considering the closeness of the evidence, the trial court's answer to the jury's question about the warrant—"What the warrant was for is not in evidence and should not be considered by you"— could not have cured the error. And, considering the trial court's invocation to the jury of the warrant's contents—"Police were there with a lawful warrant"—we cannot agree with the dissent's assertion that the error did not contribute to Hudson's conviction. *Infra* ¶ 112.

¶ 90 Having concluded the evidence sufficient to convict Hudson, no double jeopardy bar applies to retrial. *E.g.*, *People v. Davila*, 2022 IL App (1st) 190882, ¶ 91.

¶ 91 Reversed and remanded.

¶ 92 JUSTICE COGHLAN, dissenting:

¶ 93 I agree with the majority that the evidence is sufficient to sustain Hudson's conviction. I disagree with the majority's expansion of the limited police investigatory procedure hearsay exception for the purpose of preventing "improper inferences" about a defendant's conduct. *Supra* ¶ 78. The trial court properly ruled that the contents of the search warrant were not necessary to explain the officers' authority to enter Hudson's residence and had no bearing on his guilt or innocence. Where, as here, "the trial court has the power of judicial discretion and exercises it without abuse, and within the scope of the law, such action will not be disturbed by the reviewing

courts." *Whitney v. Madden*, 400 Ill. 185, 190 (1948). I respectfully dissent from the majority's reversal of a legally sound judgment based on this unprecedented application of existing law.

¶ 94    This court has historically recognized that police investigation testimony "should be admitted sparingly and only when necessary." *People v. Irwin*, 2017 IL App (1st) 150054, ¶ 29 (citing *People v. Cameron*, 189 Ill. App. 3d 998, 1004 (1989) (" ' "The need for the evidence is slight, the likelihood of misuse great." ' " (quoting Edward W. Cleary, McCormick on Evidence § 249, at 734 (3d ed. 1984)))); see also *People v. Rice*, 321 Ill. App. 3d 475, 482 (2001) ("If reviewing courts allowed the mere invocation of the words 'police procedure' to preclude further analysis, this limited exception would effectively swallow the hearsay rule with regard to police officers."); *People v. Warlick*, 302 Ill. App. 3d 595, 599-600 (1998) ("The claim that the words are not being offered for their truth does not foreclose further inquiry." "The 'police procedure' shibboleth has not proved persuasive in other cases.").

¶ 95    The unfortunate reality is "it will almost always be possible to describe testimony revealing the content of conversations with the police as evidence offered to shed light on the investigation of the crime rather than on the crime itself." *Rice*, 321 Ill. App. 3d at 482. Even in those cases where the State has legitimately elicited the testimony in question for the purpose of "shedding light on police procedure, that must not be the end of the inquiry." *Id.* at 483. The testimony must still "be relevant to a fact of consequence in the case." *Id.* We acknowledged in *Rice* that " '[t]he explanation for why the police did what they did may add nothing to the determination of the defendant's guilt or innocence.' " *Id.* (quoting 1 Barbara E. Bergman & Nancy Hollander, Wharton's Criminal Evidence § 4:47, at 489 (15th ed. 2000)). The majority's holding that "the warrant's contents had a relevant, nonhearsay purpose that supported admission" (*supra* ¶ 79) violates established precedent requiring the evidence to be relevant to a "fact of consequence in

the case." Regarding my colleagues' assumption that "the jury was thinking about the nature of the warrant" (*supra* ¶ 84), "[m]ere curiosity does not establish relevance." *Warlick*, 302 Ill. App. 3d at 600.

¶ 96    A trial court's decision on a motion *in limine* "is addressed to the trial court's inherent power to admit or exclude evidence." *People v. Williams*, 188 Ill. 2d 365, 369 (1999). Hearsay evidence is generally not admissible. Ill. R. Evid. 802 (eff. Jan 1, 2011). Under the hearsay exception for course of police investigation testimony, "a police officer *** may describe the events leading up to the defendant's arrest" only "where such testimony is necessary and important to fully explain the State's case to the trier of fact." *People v. Simms*, 143 Ill. 2d 154, 174 (1991) (citing *People v. Hayes*, 139 Ill. 2d 89, 130 (1990), and citing *People v. Johnson*, 116 Ill. 2d 13, 24 (1987)); see also *In re Jovan A.*, 2014 IL App (1st) 103835, ¶ 23 ("[A]n officer may not testify to information beyond what is necessary to explain his or her actions." (citing *People v. Edgecombe*, 317 Ill. App. 3d 615, 627 (2000))).

¶ 97    The admissibility of evidence is within "the sound discretion of the trial court, and its ruling should not be reversed absent a clear showing of abuse of that discretion." *People v. Ward*, 101 Ill. 2d 443, 455-56 (1984). In considering whether an abuse of discretion occurred, "[t]he question is not whether the reviewing court would have made the same decision if it were acting as the lower tribunal." *People v. McDonald*, 2016 IL 118882, ¶ 32. An abuse of discretion only occurs "where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. Rivera*, 2013 IL 112467, ¶ 37.

¶ 98    After considering applicable case law and the arguments of counsel, the trial court reasonably ruled that "the existence of the search warrant and the address to be searched" was relevant to explain the officers' legal authority to enter the premises, but testimony regarding the

contents of the warrant "would be inadmissible hearsay." See *People v. Virgin*, 302 Ill. App. 3d 438, 445 (1998) (improper admission of hearsay evidence undermined the fundamental fairness of the trial where the State elicited testimony over defense objection as to the actual contents of the warrant, rather than simply the fact the warrant was issued); see also *Warlick*, 302 Ill. App. 3d at 600 ("Most recently, we held admission of the words of a search warrant was reversible error, rejecting a claim the evidence was necessary to explain why the police arrested the defendant for illegal possession of cocaine." (citing *Virgin*, 302 Ill. App. 3d 438)).

¶ 99 The record establishes that the trial court's conscientious judgment was consistent with recognized principles of law. See *In re Marriage of Lee*, 78 Ill. App. 3d 1123, 1127 (1979) ("In determining whether the trial court abused its discretion, the question is *** did the trial court in the exercise of its discretion act arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceed the bounds of reason and ignore recognized principles of law so that substantial injustice resulted."). While the existence of the warrant explained "the officers' authority to enter" Hudson's residence, evidence that he was not the target of a narcotics investigation went beyond what was "necessary and important to fully explain *the State's case to the trier of fact.*" (Emphasis added.) *Simms*, 143 Ill. 2d at 174. The trial court did not abuse its discretion in barring evidence that "did not meet the threshold requirement of relevance." *Irwin*, 2017 IL App (1st) 150054, ¶ 46.

¶ 100 Other than the majority opinion in this case, no Illinois court has ever held that the existence of a search warrant casts "a cloud of predetermined guilt" over trial evidence or that course-of-investigation evidence is admissible to eliminate *improper inferences against a defendant*. *Supra* ¶¶ 5, 79. On the contrary, in *Simms*, our supreme court clarified that "[t]estimony describing the progress of the investigation is admissible even if it suggests that a nontestifying witness

implicated the defendant." *Simms*, 143 Ill. 2d at 174. Similarly, in *People v. Janis*, 240 Ill. App. 3d 805, 812 (1992), we recognized that "a reference to the fact that a judge signed a warrant does not *per se* place a judicial imprimatur of guilt on defendant." This is true "even if a logical inference may be drawn that the officer took subsequent steps as a result *** of that conversation." *People v. Jones*, 153 Ill. 2d 155, 160 (1992).

¶ 101    Relying on *People v. Rivera*, 182 Ill. App. 3d 33, 38 (1989), the majority "see[s] no reason *** the police should be mandated as the exclusive benefactors of *Rivera*'s laudable goal" of "prevent[ing] jurors from filling testimonial gaps with improper inferences about police conduct." *Supra* ¶ 78. The reason is that precedent limits our review to determining whether the trial court's evidentiary ruling was "arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *People v. Lerma*, 2016 IL 118496, ¶ 32. The trial court's failure to foresee that an "unexpected application" of the police investigatory hearsay exception would be reached by the majority in this case was not unreasonable. *Supra* ¶ 88.

¶ 102    Our holding in *Rivera* does not support the majority's novel theory that course of police investigation testimony is admissible to prevent jurors from drawing "improper inferences" against a defendant. *Supra* ¶¶ 77, 79. The trial judge in *Rivera* did "not permit the contents of the search warrant to be read to the jury." *Rivera*, 182 Ill. App. 3d at 38. The evidence was limited to the existence of a warrant for "defendant's person" for the purpose of showing "the officers' legal authorization to conduct such a search" and to prevent the inference that *the police* acted in an illegal fashion. *Id.* On review, we held that "[t]he evidence was properly admitted for the limited purpose of explaining *the conduct of the police officers*." (Emphasis added.) *Id.* The majority's reliance on *Rivera* in proposing that "an essential purpose of the course-of-investigation testimony [is] to prevent speculation by the jury for an improper purpose" is misplaced. *Supra* ¶ 79.

¶ 103   "[T]he circuit court is not *** free to disregard binding authority." *In re R.C.*, 195 Ill. 2d 291, 298 (2001). Since the majority acknowledges that "*Rivera*'s laudable goal" has not previously been applied to prevent "improper inferences" about a defendant's conduct (*supra* ¶¶ 78-79), it is impossible to reasonably conclude that the trial court erred by failing to do so here.

¶ 104   Under the majority's reasoning, a jury note[1] asking about the warrant constituted "affirmative evidence *** that they were concerned about the substance of the warrant" and that "[a] brief explanation of the warrant's target and evidence to be seized would have diffused a harmful distraction." *Supra* ¶¶ 82, 83. First of all, as stated above, mere curiosity of the jury does not establish relevance. *Warlick*, 302 Ill. App. 3d at 600. Additionally, the fact that "the jury asked for guidance during deliberations merely indicates that the jury took its job seriously and conscientiously worked to come to a just decision." *People v. Minniweather*, 301 Ill. App. 3d 574, 580 (1998). Furthermore, courts "routinely bar evidence because it is irrelevant or unreliable." *Decker v. Libell*, 193 Ill. 2d 250, 254 (2000).[2]

¶ 105   Regarding the majority's speculation that "the jury used the warrant's existence to make an improper inference" (*supra* ¶ 81), a court of review "is not permitted to speculate on the jury's thought process." *People v. Fisher*, 281 Ill. App. 3d 395, 405 (1996) (citing *People v. Collins*, 106 Ill. 2d 237, 261 (1985)); see also *People v. Allen*, 222 Ill. 2d 340, 356-57 (2006) (Speculation is completely irrelevant and "has no place in this court's review, which must be based solely on the

---

[1]One of the notes sent out during the jury's deliberations asked: "Why were the police there? What was the warrant for?"

[2]The majority "fail[s] to see, how the jury could have misused the information that officers went to the home for an unrelated investigation." *Supra* ¶ 84. However, the trial judge recognized the problem immediately, stating: "If you think there's case law that says *** it is relevant because you want to argue that it really belonged to John Smith because he was the target, isn't that kind of accepting a hearsay statement that John Smith was the target *** for the truth of the matter asserted?"

facts of record."). In any event, the trial judge properly instructed the jury that they were not to consider "[w]hat the warrant was for" in their deliberations. On review, we "must presume, absent a showing to the contrary, that the jury followed the trial judge's instructions in reaching a verdict." *Simms*, 143 Ill. 2d at 174.

¶ 106   The majority concedes that the excluded evidence did not "refer to the crime charged" or go to " 'the very essence' of the parties' dispute: whether Hudson had constructively possessed a gun." *Supra* ¶ 83. In other words, my colleagues admit that the excluded evidence was not relevant to the charges against Hudson. Relevant evidence is evidence that makes "the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." *People v. Harvey*, 211 Ill. 2d 368, 392 (2004). As a matter of well-established law, "[r]elevance is a threshold requirement that must be met by every item of evidence"; " '[e]vidence which is not relevant is not admissible.' " *People v. Dabbs*, 239 Ill. 2d 277, 289 (2010) (quoting Ill. R. Evid. 402 (eff. Jan 1, 2011)). The majority fails to explain how excluding irrelevant evidence constitutes "legal error" or "violate[s] the rules of evidence." *Supra* ¶ 87.

¶ 107   The majority erroneously cites *Simms* in support of their theory that "course-of-investigation testimony comes in when 'necessary and important' to the jury's understanding" of any issue, regardless of relevance. (Internal quotation marks omitted.) *Supra* ¶ 84. To clarify, in *Simms*, our supreme court held that "a police officer may recount the steps taken in the investigation of a crime, and may describe the events leading up to the defendant's arrest, where such testimony is necessary and important to fully explain the State's case to the trier of fact." *Simms*, 143 Ill. 2d at 174. Here, testimony that Hudson was not the target of an illegal narcotics investigation was not "necessary and important to fully explain the State's case to the trier of fact" (*i.e.*, that Hudson illegally possessed a gun). See *id*. The majority's holding that the contents of a

search warrant are admissible if the contents do not "bear on 'the very essence of the dispute' " is contrary to the established law of this state. *Supra* ¶ 84.

¶ 108    The majority relies on *Warlick*, 302 Ill. App. 3d at 598-600, in cautioning that "identifying course-of-investigation evidence must never take the place of a principled analysis of the specific facts before us." *Supra* ¶ 76. I agree. In *Warlick*, the trial judge allowed a police officer to testify that he received a radio call of a burglary in progress and proceeded to investigate. *Warlick*, 302 Ill. App. 3d at 598. This court held that the trial judge erred in admitting the radio call because it served no relevant purpose to help the jury decide the case. *Id.* at 600. We explained, "[t]here was no issue concerning the officers' reason or motive for going to the recycling center. It simply did not matter. It would have been enough for the officer to testify he received a radio message, then went to the recycling center." *Id.* As we recognized in *Warlick*,

> "[t]he trial judge first must determine whether the out-of-court words, offered for some purpose other than their truth, have any relevance to an issue in the case. If they do, the judge then must weigh the relevance of the words for the declared nonhearsay purpose against the risk of unfair prejudice and possible misuse by the jury." *Id.* at 599.

See also *People v. Hunley*, 313 Ill. App. 3d 16, 35 (2000) (unless the trial judge first determines that the out-of-court words are relevant to an issue in the case, the second step of *Warlick* analysis is not conducted).

¶ 109    Applying our analysis in *Warlick* to the facts of the instant case, it is clear that the out-of-court words (*i.e.*, substance of the search warrant) had no relevance to the charges against Hudson. "It was enough for the officers to testify" that they were at Hudson's home pursuant to a search warrant. See *Warlick*, 302 Ill. App. 3d at 600. There was "no good reason why the jury had to know" that Hudson was not the target of the search warrant or that the police were investigating

illegal narcotics, not guns. See *id.* It simply did not matter. Based on *Warlick*, the trial court properly determined that the sole relevance of the search warrant was to explain the legal authority of the officers to enter Hudson's residence.

¶ 110    Abuse of discretion is "the most deferential standard of review available with the exception of no review at all." (Internal quotation marks omitted.) *People v. Coleman*, 183 Ill. 2d 366, 387 (1998). It will be found "only when the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *Lerma*, 2016 IL 118496, ¶ 32. At the risk of stating the obvious, it cannot be said that "no reasonable man would take the view adopted by the court" in this case. *In re Leona W.*, 228 Ill. 2d 439, 460 (2008). Conversely, it is inherently unreasonable to reverse a legally sound judgment based on a novel interpretation of existing law. Although my colleagues obviously disagree with the court's decision, a reviewing court "may not simply substitute its judgment for that of the trial court on a matter within the trial court's discretion." *People v. Illgen*, 145 Ill. 2d 353, 371 (1991). Such action is contrary to Illinois law and is incompatible with our standards of review.

¶ 111    Even assuming, *arguendo*, that the court's evidentiary ruling was erroneous, such error was harmless. "An error can be harmless (i) where the error did not contribute to defendant's conviction, (ii) where the other evidence overwhelmingly supports defendant's conviction, or (iii) where the excluded evidence would have been duplicative or cumulative." *People v. Brakes*, 2021 IL App (1st) 181737, ¶ 29. I do not agree with my colleagues that the evidence was "closely balanced and definitionally not overwhelming." *Supra* ¶ 89. Regardless, "a finding of harmlessness under either of the three approaches suffices." *Brakes*, 2021 IL App (1st) 181737, ¶ 29. It follows that overwhelming evidence is not required to find an evidentiary error harmless.

See *id.* ¶ 30 (finding the evidentiary error harmless "even though the evidence was not overwhelming").

¶ 112   The evidence introduced at trial was clearly sufficient to prove Hudson guilty of possessing a gun beyond a reasonable doubt. The sole relevance of the warrant was to explain why the police were in the home. The facts "of consequence to the determination" of Hudson's guilt included the gun recovered in his bedroom closet, utility bills in his name found in the bedroom, his request that police officers retrieve his medication from the bedroom, his presence in the bedroom area when the police arrived, and his confession that he had forgotten about placing his gun in the bedroom closet. See *Harvey*, 211 Ill. 2d at 392. Since the contents of the warrant were irrelevant to the charges against Hudson, excluding that evidence did not contribute to his conviction.

¶ 113   Concerning the majority's factual determination that the police engaged in "unseemly behavior" (*supra* ¶ 11), I do not believe that it is appropriate to comment on issues that were not raised, briefed, or argued by the parties. The "standard[s] of behavior" cited in the majority's "observation[s]" also apply to appellate courts. *Supra* ¶¶ 11, 14. "It is the responsibility of the trier of fact to 'fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *People v. Toy*, 407 Ill. App. 3d 272, 286 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). None of the cases relied upon by the majority to justify condemning "misbehavior [although] not an issue in the case" suggest that it is appropriate for a reviewing court to assume this responsibility, which belongs to the fact finder. *Supra* ¶ 12.

¶ 114   A fact finder may "accept or reject as much or as little of a witness's testimony as it pleases." *People v. Sullivan*, 366 Ill. App. 3d 770, 782 (2006). In order to justify their unsolicited "observation[s]," the majority cherry-picks "testimony [that] comes from the record." *Supra* ¶¶ 8,

14. In doing so, the majority confuses testimony with facts, resolves conflicts in the testimony in favor of the Hudsons, and "step[s] over the line from neutral jurist to that of an advocate." *People v. Givens*, 237 Ill. 2d 311, 325 (2010).

¶ 115    The record clearly shows that the Hudsons' testimony is disputed. Officer Tellez testified that while he was executing the search warrant, Randy was admonished, "Chicago Police Department, search warrant, show me your hands, lay on the ground." Randy "raised both hands, flipped [him] off, said, "[F]*** y'all b***, don't touch me or I will f*** you up." Tellez repeated his verbal command to "lay on the ground and comply." When Randy again failed to comply, Tellez grabbed "a hold of him and attempted to detain him." Randy responded by stiffening his arms, clenching his fists, and yelling profanities at the officers. The officers then "rolled him to the ground and began wrestling." During the struggle, Tellez delivered "open strikes" with his hands and "knee strikes" to Randy until Tellez was able to detain him.

¶ 116    While attempting to detain Randy, Officer Rojas saw an individual later determined to be the defendant, Hudson, "coming out of the kitchen and walking towards [his] location *** quite rapidly." Hudson demanded to know why he was in the house, "got really close" to him with "his hands extended out in a menacing manner," and had to be "pushed back by his face." Rojas explained that "sometimes during the execution of a search warrant, people get upset" and "police officers are trained on how to de-escalate," a strategy he utilized during this encounter. Hudson was ultimately handcuffed and detained before the officers began searching the house.

¶ 117    As our United States Supreme Court observed in *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981), "[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned

command of the situation." In this appeal, the record is insufficient to determine whether the officers acted reasonably in attempting to "deescalate" or "exercise unquestioned command of the situation." *Id.*

¶ 118 Similarly, as the author of the majority opinion is this case recognized in *People v. Mandarino*, 2013 IL App (1st) 111772, ¶ 48:

"The officer 'is justified in the use of any force which he reasonably believes to be necessary to effect the arrest and of any force which he reasonably believes to be necessary to defend himself or another from bodily harm while making the arrest.' [720 ILCS 5/7-5(a) (West 2006)]. *** In *Graham* [*v. Connor*, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)], the Supreme Court applied a reasonableness standard—'the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.' *Id.* at 397. 'Relevant circumstances include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' *Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013) (quoting *Graham*, 490 U.S. at 396)."

¶ 119 The reasonableness of the force utilized by the officers in executing the search warrant in this case was not raised in the trial court or on appeal. As cogently explained by our United States Supreme Court in *Greenlaw v. United States*, 554 U.S. 237, 244 (2008),

"[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by

the parties. Counsel almost always know a great deal more about their cases than we do *** ." (Internal quotation marks omitted.)

"[A]n appellate court should not, and will not, consider different theories or new questions, if proof might have been offered to refute or overcome them had they been presented at the trial." (Internal quotation marks omitted.) *Hux v. Raben*, 38 Ill. 2d 223, 225 (1967).

¶ 120    "[T]he appellate court *** is not a fact-finding tribunal." *Simmons v. Union Electric Co.*, 104 Ill. 2d 444, 463 (1984). Our role is to decide the merits of cases based on the record of proceedings. Gratuitously resolving issues unnecessary to the resolution of this appeal is unfair to the officers, whose conduct is being condemned without notice and an opportunity to be heard, and inconsistent with our standards of review.

¶ 121    For these reasons, I would affirm the judgment of the circuit court.

---

***People v. Hudson*, 2023 IL App (1st) 192519**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 18-CR-12339; the Hon. Angela Munari Petrone, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Deepa Punjabi, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Daniel Piwowarczyk, and Justin Erb, Assistant State's Attorneys, of counsel), for the People. |

---